UNITED STATES of America

v.

**Pedro SANCHEZ and Mario Chalarca, Defendants.**

**No. 94 CR 1040 (SAS).**

United States District Court, S.D. New York.

March 15, 1996.

Opinion Adhering to Decision on Reconsideration May 2, 1996.

---

Daniel C. Becker, Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York City, for U.S.

Alan E. Kudisch, Kew Gardens, New York, for Defendant Mario Chalarca.

Marvin E. Schechter, New York City, for Defendant Pedro Sanchez.

### OPINION

SCHEINDLIN, District Judge.

On May 16, 1995, pursuant to a duly executed plea agreement, Pedro Sanchez ("Sanchez") pled guilty to conspiring to possess with intent to distribute cocaine. On February 13, 1996, prior to sentencing, a hearing was held with respect to two disputed issues, of which the parties received notice by this Court's Opinion of February 12, 1996 ("February 12 Opinion"). The purpose of this Opinion is to resolve each of the disputed issues.

### I. The Applicability of U.S.S.G. § 5C1.2

U.S.S.G. § 5C1.2 provides what has come to be known as a "safety valve." This provision allows defendants in narcotics cases to escape the required statutory minimum sentences if they meet certain criteria set forth in 18 U.S.C. § 3553(f)(1)–(5). In the case of specified narcotics offenses, "the court *shall impose* a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, *if the court finds* that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)–(5)...." U.S.S.G. § 5C1.2 (emphasis added). Here, the Government concedes that Sanchez has met the first four criteria. There is a dispute, however, as to whether Sanchez has met the fifth criterion which requires that "[n]ot later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense." *Id.* The parties also disagree as to whether the Government or the defendant bears the bur-

den of proving that the defendant meets the criteria set forth in 18 U.S.C. § 3553(f).

## A. *Burden of Proof*

■ Sanchez argues that the "safety valve" is not to be treated as a downward departure or mitigating factor in which the defendant bears the burden of proof. Rather, defendant argues that the "safety valve" is unique in that it requires that courts impose a Guidelines sentence rather than that required by statute, if certain conditions are met. Sanchez further argues that a defendant has the burden of going forward, namely demonstrating that he has met each of the five criteria. If he has presented evidence that he has met each of the criteria, then the burden shifts to the Government to prove that the defendant has failed to meet one or more of the relevant criteria.

Because this section is relatively new, having been promulgated in September 1994, there is little case law on point and none in this Circuit. Several courts have, in fact, described the safety valve as a downward departure. *See United States v. Rodriguez,* 69 F.3d 136, 144 (7th Cir.1995); *United States v. Edwards,* 65 F.3d 430 (5th Cir. 1995); *United States v. Hart,* 876 F.Supp. 4 (D.D.C.1995). None of these opinions, however, discusses the question of burden of proof. Two other courts touched on the burden of proof without directly addressing the issue. *See United States v. Blackwell,* 897 F.Supp. 586, 589 (D.D.C.1995) ("Defendant has not carried her burden of showing that she complied with the fifth criterion"); *United States v. Buffington,* 879 F.Supp. 1220, 1221 (N.D.Ga.1994) ("the government contends that defendant cannot meet the burden under 18 U.S.C. § 3553(f)(5) (as amended) to overcome the imposition of a mandatory minimum sentence").

I conclude that defendant has the burden of demonstrating that he meets the criteria set forth in 18 U.S.C. § 3553(f). However, once he has carried his burden of going forward, the burden shifts to the Government to prove that he has not met his burden. The ultimate burden of persuasion remains on the defendant. Ultimately, the Court must determine whether the defendant has met the criteria set forth in the statute. *See United States v. Aristizabal,* 93 Cr. 1091, 1994 WL 689089, at *1 (S.D.N.Y. Dec. 8, 1994). I turn now to the facts presented here.

## B. *Has Sanchez Met the Requirement of § 3553(f)(5)?*

■ At his plea, Sanchez allocuted to the elements of a conspiracy to possess and distribute narcotics, but stated that his cousin and co-defendant, Mario Chalarca, was not involved in the transaction. Nonetheless, the Government accepted his plea, gave him the benefit of a plea agreement, and concedes that he has demonstrated acceptance of responsibility. Sanchez then spoke to the Probation Department and admitted his participation and role in the offense, continuing to deny that Mario Chalarca was involved in the transaction. Finally, on February 1, 1996, Sanchez met with the Government in a so-called "safety valve interview" in which he again described his participation, identified the source of the money as best he could, but denied Mario Chalarca's involvement. Based on this interview, the Government takes the position that Sanchez has not been truthful and has not met the fifth criterion of 18 U.S.C. § 3553(f).

In order to make a factual determination as to whether Sanchez had met the fifth criterion, this Court held a hearing on February 16, 1996. The Government offered the testimony of one of the arresting agents who testified that Sanchez implicated Chalarca in a statement made immediately after the arrest.[1] Based on this statement, as well as Sanchez' recorded statements during the course of the conspiracy, the Government concludes that Sanchez has not been truthful.

---

1. A DEA–6 (Report of Investigation) was introduced into evidence at the hearing. The report was prepared by Case Agent Hansen, who concededly does not speak Spanish. Tr. at 116, 120. It is apparent from reviewing that report and from the February 16 hearing that Sanchez did not use the name Chalarca. Agent McNamara, who was present with Agent Hansen at the post-arrest questioning, testified that Sanchez referred to his cousin, and that he [McNamara] took that to mean Chalarca. Tr. at 116.

In response, Sanchez testified under oath and denied making the alleged post-arrest statement. He testified that he was in a state of shock, exhausted, confused and unsure of what he said or did not say. Transcript of Hearing, February 16, 1996 ("Tr.") at 55–58. Moreover, the post-arrest questions and answers involved both Spanish and English. Tr. at 116. In explaining the recorded statements made in the course of the conspiracy, Sanchez explained that he was continually "puffing" to impress the seller. Tr. at 53, 108–109. He also disputed the Government's interpretation of his statements regarding Chalarca's participation in the transaction. Tr. at 91, 96.

Based on all of the evidence submitted at that hearing, together with the record of the plea allocution, the Presentence Report ("PSR"), and the description of the safety valve interview, I find that Sanchez has truthfully provided "all information and evidence the defendant has concerning the offense."[2] I do not believe that Sanchez implicated Chalarca in any unsworn post-arrest statement.[3] By contrast, I credit Sanchez' testimony that Chalarca had no knowledge of the transaction. He has consistently taken this position before this Court and with the Government. In May 1995, at his plea allocution, Sanchez stated under oath that Chalarca was not involved. He repeated that

statement at his "safety valve interview" and at the sentencing hearing. He has done this with full knowledge that he risks ten years in jail if the Court finds that this statement is untrue. This goes a long way toward convincing me that Sanchez is being truthful. It would be easy for Sanchez to say that Chalarca was involved, especially since Sanchez knows that a jury has already found that Chalarca was involved. Sanchez' statements regarding Chalarca have the ring of truth.

The Government also argues that Sanchez is untruthful because he has failed to name the source of the money or the person to whom the drugs would be distributed. Sanchez, however, states that the person providing the money was a person known to him as Jerry (LNU) whom he met as a customer in his bar.[4] He also testified that he was to provide the drugs to the same person after purchasing them. At the hearing, Sanchez described Jerry and his contacts and conversations with Jerry. While conceding that this information is not particularly useful to the Government, usefulness is not the standard governing U.S.S.G. § 5C1.2. The sole question is truthfulness, as demonstrated by the final sentence of § 3553(f)(5): "the fact that ... the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." Sanchez

---

**2.** This case is easily distinguishable from many in which the court found that defendant had not met the fifth criterion. *See, e.g., United States v. Rodriguez,* 69 F.3d 136, 143–44 (7th Cir.1995) (rejecting defendant's argument that he provided truthful information by making statement to Probation Department); *United States v. Wrenn,* 66 F.3d 1, 3 (1st Cir.1995) (rejecting defendant's argument that he provided truthful information by virtue of statements made on involuntary recordings during conspiracy and by virtue of plea allocution); *United States v. Edwards,* 65 F.3d 430, 433 (5th Cir.1995) (affirming district court's decision not to apply safety valve where Government opposed its application and where defendant gave different account at different times of the quantity of drugs he received); *but see United States v. Hart,* 876 F.Supp. 4, 5 (D.D.C.1995) (guilty plea allocution sufficient); *United States v. Smaragdas,* CR–93–194 (E.D.N.Y. Oct. 14, 1994) (applying safety valve despite opposition from Government where defendant initially inflated her role in the offense and minimized that of her

husband, but later (prior to sentencing) told the truth).

**3.** The DEA report prepared by Agent Hansen states that Sanchez said that his cousin knew the people who would be "working on" buying the drugs. However, as established at Chalarca's trial, "primo" (the Spanish word for cousin) has various meanings, including "buddy." Chalarca Trial Tr. at 198–99. There is nothing in this report to suggest that Sanchez was more likely referring to Chalarca than to Jerry (*see* page 1008, *infra*). Because Sanchez and Chalarca were arrested together, the agent may simply have presumed that Sanchez was referring to Chalarca.

**4.** Defense counsel states that in December 1994, Sanchez' prior counsel alerted the Government to the possibility that "Jerry" might attempt to contact Sanchez regarding the lost $70,000. Sanchez was to beep DEA Agent Mike Broderick if this occurred. *See* Letter dated February 12, 1996 from Marvin Schechter, counsel for Sanchez.

appears to be a novice in the business of drugs. He lacks any prior criminal record, no proof was offered of any prior involvement with drugs, he is a legitimate businessman and he has no unexplained wealth. In addition, Sanchez acted like a novice in handling this transaction by speaking and meeting with a total stranger, neither viewing nor tasting the drugs, and never discussing the quality (purity) of the drugs. It is therefore not surprising that Sanchez would know only the first name of the man who supplied him with the funds and to whom he intended to turn over the drugs.

For all of these reasons, I find that defendant has met his burden of persuading the Court that he is entitled to the benefit of U.S.S.G. § 5C1.2. Therefore he will be sentenced in accordance with the Guidelines, without regard to the statutory minimum set forth in 21 U.S.C. § 841(b)(1)(A).

## II. *The Quantity of Drugs*

■ The second question addressed at the hearing was the appropriate quantity of drugs for which Sanchez should be held accountable at sentencing. Sanchez argues that because he lacked the intent or capability to purchase the entire 12 kilograms for which he negotiated, he should be sentenced only for the amount of drugs that he was able to purchase, namely 3.5 kilograms. By contrast, the Government argues that Sanchez must be sentenced based on the entire 12 kilograms that he negotiated for and intended to purchase.

At the hearing, the Government offered the tape recordings made during the course of the conspiracy as well as the testimony of one of the arresting agents. The Government also relies on the plea agreement, the plea allocution and the PSR. Sanchez offers only his own testimony to the effect that he never had the ability to purchase 12 kilograms of cocaine.

The Government has proved, by a preponderance of the evidence, that Sanchez is responsible for the entire 12 kilograms of cocaine. First, in his plea agreement, Sanchez agreed that the applicable Sentencing Guidelines base offense level was 32, corresponding to a quantity of cocaine of at least 5 kilograms and less than 15 kilograms. In his plea agreement, Sanchez agreed that no adjustments to the Sentencing Guidelines level were appropriate. At the plea allocution, Sanchez stated that he was fully prepared to purchase 12 kilograms when he went to the "buy" location on September 22, 1994. Plea Transcript ("Pl.Tr.") at 26. Sanchez further stated that he expected to receive $6,000 for his participation, based on a fee of $500 per kilogram. Finally, Sanchez acknowledged that this was a consignment transaction. Sanchez agreed "to give [Ortiz] $60,000, take the 12 kilos, and then pay whatever later." *Id.* at 31–32. Similarly, in his Statement of Acceptance of Responsibility, Sanchez confirmed that he had "agreed to purchase 12 kilograms of cocaine from a confidential informant. For my role in this transaction, I was to receive the sum of $500/kilo." PSR ¶ 27.

The tape recorded conversations also support the conclusion that Sanchez intended to purchase 12 kilograms and agreed to pay for them on consignment. On September 20, 1994, Sanchez met with the confidential informant ("CI"). During that conversation, the CI reminded Sanchez that after he received the initial cash payment, there would be "two more payments left." GX 8A at 4. Sanchez responded that he would have the money for the balance of the purchase price two or three days after he received the drugs. *Id.* On September 22, 1994, Sanchez appeared at the Wendy's ready, willing and able to purchase the drugs. He brought with him $70,000, which was more than the $60,000 down payment that he had agreed to make.

At the sentencing hearing, Sanchez tried to back away from his previous admissions. He now says that his taped statements were "lies" and that he never had a deal with Ortiz. This testimony is simply not credible in view of all of Sanchez' prior statements and the overwhelming nature of the evidence.

Courts have regularly held that consignment customers are responsible for the full weight of the narcotics they agree to purchase. *See, e.g., United States v. Alaga,* 995 F.2d 380, 382–83 (2d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 886, 127

L.Ed.2d 80 (1994) (conspirators accountable for purchase of full negotiated amount even where entire transaction was made possible by an extension of credit by government undercover agents); *United States v. Fowler,* 990 F.2d 1005 (7th Cir.1993) (holding that the purchase of the full amount was feasible based on the consignment agreement). There is no question here that Sanchez agreed to purchase and was capable of purchasing 12 kilograms of cocaine. His agreement was made with a coconspirator (Ortiz), not a government agent; the agreement included specific terms of price and method of payment (consignment); the agreement was performed in part in that Sanchez appeared with the down payment money which he agreed to pay once he saw the drugs;[5] and Sanchez confirmed the quantity involved in both his guilty plea and his statement to the Probation Department.

### III. *The Appropriate Offense Level*

■ Based on the 12 kilograms that Sanchez agreed to buy, his base offense level is 32. This level is decreased an additional 2 levels (to 30) pursuant to § 2D1.1(b)(4). I find that defendant is also entitled to an additional two-level reduction for his mitigating role (to 28). Based on all the evidence, I find that defendant was a minor participant pursuant to § 3B1.2. As explained in Application Note 3 to that Section, "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." The initial conspiracy was to distribute 212 kilograms of cocaine. Alba Ortiz was to receive 12 kilograms as a fee for her role in shipping the cocaine to New York. Ortiz agreed to sell these drugs to Sanchez, who was acting on behalf of an undisclosed principal who provided the money and agreed to take the drugs. Sanchez has testified that he was to receive $6,000, or $500 per kilogram, for his role in arranging the purchase on behalf of his principal. (The evidence

demonstrated that the seller was to receive and the buyer agreed to pay between $16,000 and $20,000 per kilogram of cocaine.) The level is decreased an additional 3 levels based on defendant's acceptance of responsibility (to 25). In the scheme of this overall conspiracy, I conclude that Sanchez played a minor role. Because Sanchez has no prior record he is in Criminal History Category I. Thus, he faces a sentence of 57 to 71 months incarceration.

### IV. *Downward Departure*

Pursuant to *United States v. Jagmohan,* 909 F.2d 61 (2d Cir.1990), the Government is entitled to prior notice of the Court's intention to consider a downward departure. While I have not yet made a final determination, I am considering a downward departure based on (a) a single aberrant act pursuant to U.S.S.G. Ch. 1, Pt. A.4(d); and (b) mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission pursuant to § 5K2.0 such as extreme financial pressures combined with defendant's absolute lack of the sophistication usually demonstrated by those involved in large-scale narcotics transactions. Sentence is scheduled for March 28 at 4:30 p.m.

### *OPINION ON RECONSIDERATION*

SCHEINDLIN, District Judge.

### I. *Introduction*

By letter brief dated April 2, 1996 ("Gov't Brief"), the Government seeks reconsideration of that portion of this Court's March 15, 1996 Opinion finding that defendant Pedro Sanchez ("Sanchez") is entitled to a role adjustment as a "minor participant" pursuant to U.S.S.G. § 3B1.2. For the reasons set forth below, this Court adheres to its initial determination.

The Government's first attack is indirect. The Government appears to suggest that because both the Government and the defen-

---

**5.** It is irrelevant that the transaction did not occur because of the intervening arrest. *See United States v. Howard,* 998 F.2d 42, 51 (2d Cir.1993) (defendants who intended to steal three kilograms of cocaine were "reasonably capable" despite the fact that no cocaine was in the apart-

ment); *United States v. Pimentel,* 932 F.2d 1029, 1031 (2d Cir.1991) (defendants were reasonably capable of providing narcotics when it was their arrest, not their lack of intent or capability, that prevented them from producing the agreed upon amount of drugs).

dant agreed in the plea agreement that "no role adjustments were warranted in this case" the Court is somehow estopped from imposing a role adjustment. For example, the Government noted that "Sanchez further agreed that no adjustments or departures were appropriate" and that "defendant did not object to the Probation Department's finding that no departures or role adjustments were warranted in this case." Gov't Brief at 9. The Government also criticized the Court for not advising the Government that it was considering a role adjustment prior to issuing an opinion concluding that a role adjustment was warranted. *Id.* at 2 n. 1. Neither argument makes much sense.

█ Courts repeatedly inform the parties at the time a plea is entered that the Court is not bound by the terms of the plea agreement. Indeed, the plea agreement letter states at page 3 that "[n]either the Probation Department nor the Court is bound by the above Guidelines stipulation." Rule 11(e)(1) of the Federal Rules of Criminal Procedure forbids the Court from participating in plea negotiations. While a court is required to provide notice of its intent to depart from the Guidelines, *see e.g., United States v. Jagmohan,* 909 F.2d 61, 63 (2d Cir.1990), I am not aware of any similar requirement with respect to role adjustment. Nonetheless, by issuing a written opinion two weeks prior to the scheduled sentence, the Court provided adequate notice.

The Government next argues that the role adjustment is "inappropriate," "not warranted," and "unfounded." Gov't Brief at 2, 16. It is undisputed that a district court's finding as to a defendant's role in a criminal activity is a factual determination. *United States v. Martin,* 78 F.3d 808, 814 (2d Cir.1996) (citing *United States v. Shonubi,* 998 F.2d 84, 90 (2d Cir.1993)). Nonetheless, the Court must apply the appropriate legal standard in reaching its determination. Based on the totality of the circumstances in this particular case, it is my determination, once again, that Sanchez is entitled to a minor role adjustment.

## II. *Factual Background*

The relevant facts are set forth in this Court's Opinion of March 15, 1996. *See also* orders and opinions in this case dated February 12, February 29 and March 18, 1996. Because the facts have been covered so many times, I will not repeat them here. To the extent necessary, the facts will be restated in the discussion that follows.

## III. *Legal Standard*

█ In order to obtain a downward adjustment under U.S.S.G. § 3B1.2(b) a defendant

> must prove his or her reduced culpability by a preponderance of the evidence. A sentencing court's assessment of the defendant's role in criminal activity is highly fact-specific and depends upon "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." . . .
>
> . . . .
>
> . . . It is not defendant's exact role or status in the criminal activity that necessarily decides this question; rather, it is an assessment of defendant's culpability *in the context of all the circumstances.*

*Shonubi,* 998 F.2d at 90 (citing *United States v. Garcia,* 920 F.2d 153, 155 (2d Cir.1990) (per curiam)) (emphasis added).[1]

> The fact that [a defendant] played a minor role in his offense "vis-a-vis the role of his co-conspirators" is insufficient, in and of itself, to justify a two level reduction; [a defendant] must have similarly played a minor role in comparison to the average participant in [a] crime.

*United States v. Ajmal,* 67 F.3d 12, 18 (2d Cir.1995) (granting new trial on other grounds, but noting that court must consider both role in instant offense and role com-

---

1. In *United States v. LaValley,* 999 F.2d 663, 665–66 (2d Cir.1993), the court remanded a case for reconsideration in view of the trial court's conclusion that a "steerer" or "facilitator" could never qualify for a minor adjustment. The appellate court held that the trial court must make the required factual findings as to whether defendant was a "minor participant."

pared to "average" participant in determining whether to grant role adjustment).

■ To obtain a sentence reduction for being a "minor participant," a defendant has the burden of establishing "by a preponderance of the evidence that he or she is entitled to a reduction due to his or her reduced level of culpability." *United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir.1992). In deciding whether a reduction is warranted, the district court is entitled to accept or reject the credibility of any witness, including the defendant.

## IV. *Discussion*

### A. *This Conspiracy*

#### 1. *Defendant's relationship to other participants*

■ As fully discussed in the prior opinion, Sanchez had no relationship whatsoever to the conspiracy to move the original 212 kilograms of cocaine from Texas to New York. The Government correctly notes that he was not charged with this conduct. This lack of relationship does indicate, however, that the defendant had no connection to those who ultimately provided the drugs. Sanchez testified that he met a woman named Alba (known by the Government to be Alba Ortiz) around 1992. Transcript of Sentencing Hearing held February 16, 1996 ("Sent.Tr.") at 37. Ortiz asked Sanchez if he might be able to find a buyer for a quantity of drugs she had. *Id.* at 37–38. Sanchez responded that he did not know of anyone. *Id.* at 38. There is no proof of any overture from Sanchez to Ortiz. On the day of her arrest (September 18), in an effort to cooperate, Ortiz attempted to arrange a meeting with Sanchez.

After Ortiz declined to cooperate further, Sanchez began to receive calls from a confidential informant ("CI"), someone the Government concedes he did not know (*see generally* Trial Transcript at 136–37), who urged him to complete the transaction. Obviously Sanchez had no relationship with the CI, who

was a government agent and could not be considered a member of the conspiracy. The first call occurred on September 20, two days after the call from Ortiz. From September 20 through September 22, there were seven taped telephone calls between the CI and Sanchez.[2] It appears that the CI placed five of those calls and that Sanchez placed the other two calls. In at least one of the calls Sanchez placed, he was responding to the CI's page (*see* GX 8A at 1). This is clear from a review of the transcripts. Finally, the only other member of the conspiracy is the buyer. Sanchez testified that the money was supplied by a man named Jerry, a customer in his bar. While the Government believes that the money was supplied by Sanchez' cousin (who is also his co-defendant), I have already rejected this contention for lack of proof. Thus, I accept the fact that Jerry (LNU) was the buyer. That Sanchez had little or no relationship with Jerry is evident from Sanchez' ignorance of Jerry's last name and his inability to lead the agents to Jerry.

There is no proof anywhere in the record that Sanchez was a regular member of any organization. While the Government has great latitude to produce relevant information to the sentencing court, it has produced nothing showing that Sanchez had any previous "drug" relationship with Ortiz or Jerry or anyone else in this conspiracy.

I specifically credit Sanchez' testimony at the Sentencing Hearing.[3] I do not believe he was an experienced drug dealer. I do not believe he knew the buyer (except casually), and the Government admits that Sanchez did not know the eventual seller. His conduct was naive and unsophisticated. The Government has offered no evidence to impeach Sanchez; rather, it finds his version of events inherently incredible. I disagree.

#### 2. *Defendant's importance to the success of the venture*

A review of the seven tape recorded telephone conversations between Sanchez and

---

2. There are actually eight transcripts of phone calls from September 20 to 22. However, two of the transcripts (GX 5A and 5B) represent the same conversation. That conversation, on September 21 around 4:30 p.m., was cut off in the middle.

3. Indeed, I have done so previously. *See* Opinion dated February 29, 1996 at 11.

the CI reveals that during at least one conversation, the CI explicitly urged Sanchez to come up with the money and complete the deal. *See* GX 5A at 2–3; GX 5B at 2–3. The Government dwells on the fact that at one point the CI suggested that he might sell the drugs to another customer and that Sanchez "implored" him to wait. This cuts both ways. While it may show that Sanchez wanted to complete the transaction, it also shows that he was not critical to the success of the venture. Ortiz, now replaced by the CI, could have sold the drugs to any number of buyers. The key players were those who brought the cocaine to New York and those who were arranging to sell it to any willing and able buyer. Sanchez was surely replaceable.

### 3. *Defendant's awareness of the nature and scope of the criminal enterprise*

As already noted, Sanchez did not know the source of the drugs, nor the participants in the transaction. When Ortiz stopped calling, Sanchez responded to a total stranger, a CI with whom he had no prior relationship. Most telling is the fact that Sanchez had never viewed the cocaine and was unaware of its level of purity: He appeared to agree on a price of $16,000 per kilogram without any knowledge of the quality of the goods. Sanchez made no attempt to negotiate a better price for the drugs; did not know the person from whom he planned to buy the drugs; did not know the last name of the person (Jerry) to whom he planned to turn over the drugs— in fact, Sanchez stated that he was unable to find or contact Jerry unless Jerry appeared in his bar (*see* Sent.Tr. at 41); and did not know that the drugs he planned to buy were part of a larger (and concededly different) conspiracy to move cocaine from Texas to New York. In short, Sanchez appears wholly unfamiliar with the business of buying and selling narcotics. These factors demonstrate that he was unaware of the nature and scope of the criminal enterprise.

Based on the "context of all the circumstances," defendant has met his burden of demonstrating that he played a minor role in this offense as compared to his co-conspirators.

### B. *The Average Participant*

Application Note 4 to § 3B1.2 requires that the culpability of the defendant be compared with that of the typical offender convicted of the same federal crime. "The inference drawn from this Application Note is that the Sentencing Commission intends for culpability to be gauged relative to the elements of the offense of conviction, not simply relative to co-perpetrators." *United States v. Pena*, 33 F.3d 2, 3 (2d Cir.1994).

There are many roles in a conspiracy. A typical conspiracy involves a supplier, a courier, a middleman and a buyer. If his role must be typed, Sanchez must be classified as a middleman. His role was to bring together the buyer and the seller. For his efforts, he was to receive a fee of $500 per kilogram. The Court must then focus on the typical offender convicted on conspiracy.

The most culpable conspirator is usually the supplier, the conspirator who controls large quantities of drugs. The courier also ranks high on the culpability scale because he or she carries drugs from place to place and often uses weapons or other elements of violence. The next most culpable must be the buyer as he or she distributes quantities of drugs to other dealers, thereby becoming a retail level supplier. In my view, the least culpable is the facilitator (or those who assist the deal by acting as driver or lookout).[4] As

---

4. It is interesting that every "middleman" case cited by the Government emanates from the Seventh Circuit. *See United States v. Cea*, 963 F.2d 1027, 1033 (7th Cir.), *cert. denied*, 506 U.S. 899, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992); *United States v. Navarez*, 954 F.2d 1375, 1382 (7th Cir. 1992); *United States v. Boyer*, 931 F.2d 1201, 1205 (7th Cir.), *cert. denied*, 502 U.S. 873, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991); *United States v. Brick*, 905 F.2d 1092, 1095 (7th Cir.1990).

The Second Circuit cases cited by the Government were all instances in which the trial court *denied* the role adjustment. In each case, the appellate court found that this decision was not clearly erroneous. *See Shonubi*, 998 F.2d at 90 (defendant acted as a courier); *Soto*, 959 F.2d at 1187 (defendant was entrusted with large quantities of narcotics to be packaged for distribution); *United States v. Olvera*, 954 F.2d 788, 793 (2d Cir.), *cert. denied*, 505 U.S. 1211, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992) (defendant weighed nar-

a facilitator, Sanchez is by definition less culpable than the typical offender convicted of conspiracy to distribute drugs.

Going one step further, I shall try to compare Sanchez to a typical facilitator. I would think that a typical facilitator has regular clients—either buyers looking for a source of drugs or sellers seeking buyers. This role would result in repeated instances of arranging sales. Sanchez appears to be atypical. The Government has called the Court's attention to only one transaction. Sanchez had a great deal of trouble producing the required money. He agreed to a price without viewing or sampling the drugs. He did not know either the seller or the buyer. He had no weapon (nor did his driver) and he met the CI in a public place, although he tried to avoid doing so. These facts lead me to conclude that he was an atypical facilitator. For these reasons, Sanchez has demonstrated that he is less culpable when measured against the "average participant."

cotics; secreted drugs around his apartment; was present when co-defendants sold cocaine and negotiated drug sale; and acted as driver); *United States v. Pimentel,* 932 F.2d 1029, 1034 (2d Cir.1991) (defendant was present during two negotiations and guarded money); *Garcia,* 920 F.2d at 154–56 (defendant acted as courier).