**UNITED STATES of America,**

v.

**Gregory AYALA, Defendant.**

**No. S8 97 CR 786 SAS.**

United States District Court,
S.D. New York.

July 26, 1999.

Katherine Baird, Robin Baker, Mary Mulligan, Assistant United States Attorneys, New York City, for U.S.

Marc Fernich, New York City, for Defendant.

## *OPINION*

SCHEINDLIN, District Judge.

### *Background*

After a three-month trial, defendant Gregory Ayala was found guilty of, *inter alia*, participating in a Racketeer Influenced and Corrupt Organization ("RICO") enterprise known as Power Rules. Seventeen or more defendants were charged with participating in this enterprise. Many of the defendants pled guilty; several entered into cooperation agreements. Ayala, together with six other defendants, were tried in a joint trial. One of the key allegations against the remaining defendants is that they had attempted to kill their co-defendant Gregory Ayala.

During the relevant time period, Ayala was associated with the Avenue St. John Boys, an organization involved in the distribution of heroin and crack cocaine. During 1994–1995, Ayala joined forces with Miguel Guzman, a co-defendant and the leader of Power Rules. That relationship broke down, however, when Ayala began dealing directly with Guzman's heroin supplier, "Viejo." A war ensued between Guzman's Power Rules gang and

the Avenue St. John Boys, which continued its drug distribution activities independent of Power Rules. It is undisputed that the Power Rules gang sought to kill Gregory Ayala.

Defendant was convicted at trial of all four counts charged in the indictment. These counts include: (1) participating in a RICO enterprise (Count 1), the substantive RICO count, (2) conspiracy to participate in a racketeering enterprise (Count 2), the RICO conspiracy count, (3) conspiracy to possess with intent to distribute heroin (Count 29); and (4) conspiracy to possess with intent to distribute crack (Count 31). The RICO conspiracy conviction was based on the following predicate racketeering acts which the jury found were proven: (1) conspiracy to distribute heroin and the distribution of heroin (Acts 17A and B) and (2) conspiracy to distribute crack and the distribution of crack (Acts 19A and B).

Pursuant to United States Sentencing Guideline ("U.S.S.G.") § 3D1.2, all counts involving substantially the same harm are grouped together into a single group. The guideline for RICO convictions is found in § 2E1.1. This section provides that the base offense level is the greater of either 19 or that applicable to the underlying racketeering activity. Here, that activity is the heroin and crack distribution, which covers the same conduct as the convictions on the remaining counts. The base offense level for the single group made up of the RICO counts and the narcotics counts is 38 pursuant to § 2D1.1(c)(2), based on the findings set forth below.

Several issues involving the setting of the offense level and departure motions are in dispute. In addition to extensive briefing, a *Fatico* hearing was held to resolve these issues.

### Setting the Offense Level

A. Determining the amount of drugs attributable to Ayala Which acts of drug dealing are part of the offense of conviction, and which are part of relevant conduct?

B. Should an enhancement be added, pursuant to U.S.S.G. § 2D1.1(b)(1), for the presence of weapons in the vicinity of the drug dealing?

C. Should there be an enhancement for Ayala's role in the offense pursuant to U.S.S.G. § 3B1.1? If so, what should that enhancement be?

D. Should certain conduct, including uncharged acts of assault and attempted murder, be included as relevant conduct pursuant to U.S.S.G. § 1B1.3?

### Departure Motions

A. Should there be an Upward or Horizontal Departure, pursuant to U.S.S.G. § 4A1.3, because Ayala's Criminal History Category does not adequately reflect the seriousness of his past criminal conduct or the likelihood that he will commit other crimes?

B. Should there be a Downward Departure, pursuant to U.S.S.G. § 5K2.0, for Extraordinary Family Circumstances?

C. Should there be a Downward Departure, pursuant to U.S.S.G. § 5K2.0, for a combination of unique circumstances, including: extraordinary family circumstances, multiple adjustments found by a preponderance of the evidence, the quantity of drugs fails to account for the quantity/time factor, extreme financial pressure and lack of sophistication, Congress' rejection of the Sentencing Commission's recommendation to eliminate or reduce the crack/powder cocaine sentencing disparity, and a straight Guidelines sentence will be disproportionate to that received by similar offenders nationwide?

### Setting the Offense Level

#### A. Drug Quantity

 The base offense level in a drug conviction is set by determining the quan-

tity of drugs in which a defendant trafficked, *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir.1993), or in the case of a conspiracy, the amount in which his co-defendants trafficked if that amount was reasonably foreseeable to the defendant. U.S.S.G. § 1B1.3(a)(1)(B). *See also United States v. Santiago*, 906 F.2d 867, 871–73 (2d Cir.1990). The quantity of drugs is a fact question for the district court, subject to a clearly erroneous standard of review. *United States v. Hazut*, 140 F.3d 187, 190 (2d Cir.1998). It is the Government's burden to establish the drug quantity by a preponderance of the evidence. *See United States v. Moreno*, 98 CR 1293, 1999 WL 415174, at *5 (2d Cir. June 22, 1999); *United States v. Prince*, 110 F.3d 921, 925 (2d Cir.1997). The Guidelines provide that where "there is no drug seizure ... the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, Application Note 12. In doing so, the court is permitted to rely on any information it knows about. *United States v. Jones*, 30 F.3d 276, 286 (2d Cir.1994).

To begin with, the charged heroin conspiracy ran from 1995 through 1996 and the charged crack conspiracy ran from 1986 through 1997. The charged heroin conspiracy states that Miguel Guzman, Ayala, Angel Santiago and Daniel Ortiz, together with other co-conspirators, conspired to distribute a kilogram or more of heroin. The charged crack conspiracy states that Guzman, Rolando Lorenzo, Ayala, Edwin Rivera, Santiago, Samuel James Smith, Pablo Villela, Ortiz, together with other co-conspirators, conspired to distribute more than 50 grams of cocaine base. Thus, with respect to the narcotics counts, the charged conspiracies only include the conduct that Ayala undertook together with the individuals named in the indictment. The evidence at trial and at the *Fatico* hearing revealed that Ayala only participated in these conspiracies from sometime in 1994 throughout 1995. By January 1996, Ayala was no longer a member of these conspiracies. Any evidence relating to Ayala's drug distribution within this time frame is part of the offense of conviction. Evidence that Ayala was involved in a different and separate conspiracy to distribute drugs can only be considered under a relevant conduct analysis. To hold otherwise would make these counts duplicitous—charging more than one conspiracy in a single conspiracy count. *See United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir.1992).

In order to determine whether evidence of Ayala's drug dealing, separate from the offense of conviction, should be considered, the Court is required to undertake a relevant conduct analysis. U.S.S.G. § 1B1.3(a)(1)-(4) sets forth the permissible boundaries of relevant uncharged conduct. Subsection (1) refers to all acts of the defendant and foreseeable acts of co-defendants that occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Subsection (2) refers to "all acts that were part of the same course of conduct or common scheme or plan as the offense of conviction." Subsection (3) refers to harm that resulted from the acts and omissions described in the previous two sections and all harm that was the object of such acts and omissions. Finally, subsection (4) refers to any other information specified in the applicable guideline.

The most relevant subsections are (1) and (2). Specifically, § 1B1.3(a)(1)(A) requires that "in the case of a jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" shall be considered so long as the activity occurred during the commission of the offense of conviction. Section 1B1.3(a)(2) directs the court to consider all acts of a defendant that were part of the same course of conduct or common scheme or plan as the offense of conviction. Thus, during the offense of conviction, Ayala is responsible not only for his own drug dealing, but also for the reasonably foreseeable conduct of his co-conspirators during that time. In addition, he is responsible for

drug dealing before and after the offense of conviction, if it was part of the same course of conduct or of a common scheme or plan as the offense of conviction.

The evidence reveals that Ayala was involved in drug dealing both before and after the offense of conviction. Prior to joining forces with Guzman, he maintained two drug dealing spots, one on Avenue St. John and one at the Hunts Point market. After he ceased doing business with Guzman, he continued selling drugs on Avenue St. John. I conclude that both the pre-offense and post-offense drug dealing are relevant conduct under § 1B1.3(a)(2). During each time period, Ayala distributed heroin and crack. He always operated out of the same location (Avenue St. John) and always used the same employees—Harold and HecTec. He may even have used the same source of the drugs. In addition, I conclude that Ayala is responsible for the total amount of drugs distributed by the Power Rules drug distribution conspiracy throughout 1995. There is no doubt that Ayala was aware that there were many drug spots being operated by the group and that Viejo, his heroin source, was also supplying other members of the conspiracy. He was aware that Guzman, the leader of the group, was being paid fees for permitting distributors to work at specific sites.

Based on the trial testimony and the testimony offered at the *Fatico* hearing, I conclude that the base offense level should be 38. Because two different drugs are involved, both are converted to their marijuana equivalent. If Ayala dealt the equivalent of 30,000 kilograms of marijuana, then he falls within this level. With respect to crack, there is no doubt that the preponderance of the credible evidence both at the trial and the hearing demonstrate that Ayala dealt in at least 62 grams of crack a week during the course of the conspiracy. Assuming he dealt in this amount for two years (1994–96), then he

conservatively is responsible for 6,000 grams of crack. According to § 2D1.1, 1 gram of crack converts to 20 kilograms of marijuana. Accordingly, 1,500 grams of crack converts to 30,000 kilograms of marijuana and 6,000 grams of crack converts to 120,000 kilograms of marijuana.

Similarly, the preponderance of the credible evidence demonstrates that Ayala purchased 200 bundles of heroin no less than once a week. Each bundle of heroin is divided into 10 glassine bags. Thus, 200 bundles equals 2,000 bags. Expert testimony, offered by stipulation of the parties, reveals that each glassine contains approximately ½ grain of heroin. [If one extrapolated from the 3–bag seizure of "Bad Boy" heroin from co-defendant Daniel Ortiz it would approximate ⅔ grains per bag]. However, using the expert typical figure, which is less than the quantity per bag in the Ortiz seizure, 200 bundles of heroin contains approximately 1,000 grains. There are approximately 15,000 grains in a kilogram. Thus, Ayala dealt 1 kilogram of heroin approximately every four months. If this went on for two years (1994–95), he personally is responsible for the sale of 6 kilograms. One kilogram = 1000 grams. According to the drug quantity tables, 1 kilogram of heroin converts to 1,000 kilograms of marijuana. Thus, in marijuana equivalents, Ayala is responsible for an additional 6,000 kilograms of marijuana. The combination of crack and heroin, for which Ayala is responsible falls well over 30,000 kilograms of marijuana. If one then considers the amount of drugs being dealt by other members of the conspiracy, for which Ayala is responsible under a foreseeability analysis, it simply seals the base offense level at 38, since the other members of the conspiracy dealt at least as many drugs as Ayala himself.

These quantity findings are based on the trial testimony of Luis Soto, the hearing testimony of Luis Soto and Tommy Perez, and Ayala's own statement to the police at the time of his arrest.[1] Soto's and Perez'

---

1. In his post-arrest statement, taken down by New York City Police Detective Miraglia, Ayala admitted to selling between five and six

bundles of crack for three years until 1994 when "Whiteboy" John was killed. (There

testimony were very consistent with respect to the quantity of drugs Ayala was selling at each location—Hunts Point in 1994, the parking lot in early 1995 and the lobby of his building later in 1995. In addition, Ayala admitted in his post-arrest statement that he picked up approximately 200 bundles of heroin a week from Viejo, which again is remarkably consistent with the testimony of Soto. Defense counsel has attacked Soto's credibility arguing that he had little personal knowledge of Ayala's activities in 1995, as he was only in the neighborhood for 3 weeks in June and 3 weeks in December. In addition, Soto was a drug user and now has a motive to exaggerate in order to earn a § 5K1.1 letter. He makes much the same argument as to Perez—namely that he has little personal knowledge of Ayala's activities, was on drugs, and also wants to earn a § 5K1.1 letter. Finally, he attacks Ayala's confession as inherently unreliable. While each of these attacks, individually, might carry the day, the problem for the defendant is that the three sources of quantity testimony are consistent. Each of the two accomplices saw Ayala buy heroin from Viejo. Ayala, in turn, admitted to buying heroin from Viejo. All came up with the same figures as to quantity.

The same is true of the testimony regarding crack. Both Soto and Perez actually saw Ayala dealing crack. Tr.1[2] at 6; Tr.2[3] at 51. Soto accompanied him when he purchased the crack. Tr.1 at 32–33. Finally, Ayala admitted to selling between 5 and 6 bundles of crack per day, or 180 $2 vials or $360 per day for three years. Tommy Perez testified that when he was at Hunt's Point, he was selling $5,000 of crack a day, which he said amounted to between 125 and 200 grams. Tr.2 at 53, 77–78. Tommy Perez believed that Ayala was doing the same quantity based on his visual observations of Ayala's Hunts Point spot and later his Avenue St. John spot. Tr.2 at 58. In addition, as noted earlier, Soto testified that Ayala was purchasing between 62 grams and 125 grams of crack per week. Tr.1 at 29. At that rate he would have dealt 6,000 grams (or 120,000 kilograms of marijuana) in two years. Finally, applying Perez' price figures most favorably to Ayala would mean that 1 gram of crack = $250. According to Ayala's own statement, that meant he was selling about 1.5 grams per day. He admitted that he sold this quantity for 3 years but st pped when Whiteboy John was murdered in December, 1994. At 300 days per year, that amounts to 350 grams per year or 1,000 grams in 3 years. But, the proof is well established that he sold for at least an additional two years after Whiteboy John's death, bringing the total to 1,500 grams or 30,000 kilograms of marijuana. As with the heroin calculations, the evidence collectively is more than sufficient to establish that the crack that he dealt alone would place him in level 38. When combined with the amounts dealt by others in the conspiracy and with the heroin, the quantity is established by clear and convincing evidence, if not beyond a reasonable doubt.

## B. Gun Enhancement

The Government next argues that a two-level enhancement is warranted, pursuant to § 2D1.1(b)(1), because Ayala possessed firearms in connection with his narcotics business. The enhancement, known as a specific offense characteristic, states that "if a dangerous weapon (including a firearm) was possessed, increase by 2 levels." This section relates solely to offenses involving drugs. The Application Note to this section states: "The enhance-

---

were 30 $2 vials in each bundle). Although this statement was not received in evidence at trial nor was it the subject of a motion to suppress, it may be considered by the Court for purposes of sentencing. While defense counsel challenged the reliability of the statement in his Sentencing Memorandum for sentencing purposes, he did not offer any evidence to dispute it at the *Fatico* hearing.

**2.** "Tr.1" refers to pages of the *Fatico* hearing held on June 23, 1999.

**3.** "Tr.2" refers to pages of the *Fatico* hearing continued on June 29, 1999.

ment for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1., Application Note 3. The enhancement must be proved by a preponderance of the evidence. *See United States v. Lynch,* 92 F.3d 62, 67 (2d Cir.1996).

Ayala was not charged at trial in a 18 U.S.C. § 924(c) count. No evidence was offered at trial with respect to weapons at the Avenue St. John drug spot. At the *Fatico* hearing, however, Soto testified that Ayala kept guns both in the building in which he lived and in an apartment building where the drugs were stored. Tr.1 at 47, 50–51. *See United States v. Sweet,* 25 F.3d 160, 163 (2d Cir.1994) (guns found in residential trailer where cocaine was stored); *United States v. Wilson,* 11 F.3d 346, 355 (2d Cir.1993) (guns kept in apartment where drugs and proceeds kept); *United States v. Pellegrini,* 929 F.2d 55, 56 (2d Cir.1991) (same).

Soto described a number of different guns, including two AR–15s, which he described as a large assault rifle, a shotgun including a .40 caliber and a 9 millimeter, a MAC–11, and an UZI. Tr.1 at 41, 47. It was not clear from Soto's testimony whether the guns were kept in the same apartment as the drugs. Soto did not testify that Ayala carried any gun when he bought drugs. In addition, according to Soto, Ayala was not armed when he went around the neighborhood, even when he went driving around looking for Guzman. Tr.1 at 101–02. On at least two of the occasions, when he allegedly went to look for Guzman, he was unarmed. Only after he located Guzman did he return to his block and pick up a gun. Tr.1 at 46–47. Neither Soto nor Perez testified that Ayala ever fired a shot at Guzman.

Soto testified that Ayala fired shots into a pool hall which was known as a Power Rules hang-out, but that he didn't know if Guzman was there when he fired. Tr.1 at 48–49. Soto, of course, also testified that Ayala shot him (Soto) as part of the war. Tr.1 at 54. Tommy Perez also testified that Ayala used weapons. Tr.2 at 61. He testified that HecTec, one of Ayala's employees, carried a weapon at the Avenue St. John drug spot. Tr.2 at 60. He further testified that Ayala, himself, showed him that weapon in the lobby of the building, which was a drug spot. Tr.2 at 62. Perez also testified that on another occasion, Ayala pulled a weapon (a revolver) from the hood of his car, gave it to Perez, who eventually used it that day to shoot Guzman's uncle. Tr.2 at 70.

The evidence presented by Soto and Ayala is sufficient to warrant an enhancement for possession of a weapon. *See United States v. Simmons,* 164 F.3d 76, 79 (2d Cir.1998) (defendant armed himself for protection in anticipation of crack deal); *Lynch,* 92 F.3d at 67 (witness saw defendant carrying a firearm during the course of a narcotics transaction); *United States v. Quintero,* 937 F.2d 95, 97–98 (2d Cir. 1991) (weapon "possessed as a security measure" during drug sales and meetings). I find by both the preponderance of the evidence and by clear and convincing evidence that Ayala possessed weapons in connection with the narcotics offenses of which he was charged and convicted. While the two accomplices have a significant motive to lie, used drugs, have difficulty accurately remembering details of places and dates, and may not be accurate to a scientific certainty with respect to drug amounts, their testimony with respect to the weapons possessed by Ayala has a ring of truth. Given all of the trial testimony, it is inconceivable that Ayala did not possess weapons in connection with his drug business. The specific testimony regarding the number and locations of guns described by Soto and Perez is credible. Thus, two levels are added (to 40) based on the weapons enhancement as required by § 2D1.1(b)(1).

## C. Leader or Organizer

 The Government next argues that a 4–level aggravated role enhancement is warranted, pursuant to § 3B1.1, based on proof that Ayala was a leader or organizer of criminal activity involving five or more participants. The party seeking a sentencing adjustment, here the Government, has the burden of proving facts to support it. *United States v. Smith*, 174 F.3d 52, 57 (2d Cir.1999); *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir.1992) ("if the government seeks increased punishment, it has the burden of proving that the circumstances warrant such an increase"). Ordinarily, the Government must prove the enhancement by a preponderance of the evidence. *United States v. Livoti*, 22 F.Supp.2d 235, 242 (S.D.N.Y.1998) (citing *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir.1992)).

### 1. The RICO Convictions

The first question is whether the Government has proved that Ayala was an organizer or leader of Power Rules (the RICO counts). Here, the evidence shows that Ayala and Guzman made an agreement, whereby Ayala was permitted to continue dealing drugs in the area of Avenue St. John and Southern Boulevard. This does not, however, prove that they were equal partners, as the Government alleges. Indeed, most of the proof at trial revealed that they were rivals who, for a short time, agreed to work together rather than against each other.

There was no proof that Ayala participated in the extortion of rent (for drug spots), which was the modus operandi of Power Rules, or in the violence toward other drug dealers. In fact, the only proof of violence by Ayala, was used *against* Power Rules, not on its behalf. Finally, there is no proof that Ayala gave orders to Power Rules members or received a share of any other drug spots. Thus, the preponderance of the evidence does not establish that Ayala was a leader, organizer, manager or supervisor of Power Rules.

### 2. The Charged Narcotics Conspiracies

The next question, then, is whether the Government has proved that Ayala was a leader or organizer of the narcotics conspiracies for which he was convicted. At trial and at the hearing, the Government attempted to prove that Ayala was the leader or organizer of a narcotics conspiracy involving five or more participants. Specifically, the Government offered proof that the spot was supplied by Viejo, Guzman took part of the profits, HecTec and Harold were managers and sometimes pitchers, Luis Soto worked with Ayala, and other unidentified people bottled the crack that Ayala purchased.

I am satisfied that the evidence clearly establishes that five or more people were involved in the Power Rules drug conspiracies charged in the indictment. But, the remaining issue is whether Ayala was an organizer, leader, manager or supervisor of the Power Rules drug conspiracy. *See United States v. Liebman*, 40 F.3d 544, 548 (2d Cir.1994) (§ 3B1.1 targets only those who exert control "over others involved in the commission of the offense"); *United States v. Greenfield*, 44 F.3d 1141, 1147 (2d Cir.1995) ("To qualify for an adjustment under § 3B1.1, the defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.").

To make this determination, the Guidelines suggest that the Court consider whether Ayala exercised decision-making authority, the nature of his participation in the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *See* U.S.S.G. § 3B1.1, Application Note 4.

The evidence offered is insufficient to establish that Ayala was a leader or orga-

nizer with respect to the charged drug conspiracies. The evidence is also insufficient to establish that he was a manager or supervisor in these conspiracies. It must be remembered that the charged drug conspiracies were those in which he conspired with Guzman, Santiago, Ortiz, Lorenzo, Rivera, Smith and Vilella. The only evidence on this point was offered at the evidentiary hearing in which both Luis Soto and Tommy Perez testified. Both of these witnesses testified solely with respect to the Avenue St. John spot. Perez did not work with Ayala during the time he was aligned with Power Rules. Tr.2 at 52. He has no personal knowledge of Ayala's role in those conspiracies. While Soto did work with Ayala briefly in late 1995, his testimony does not establish any of the points that the Application Note suggests prove leadership.

There is no evidence that Ayala exercised decision making authority within the Power Rules drug conspiracy, that he recruited anyone to work in that conspiracy, or that he took a larger share than anyone else of the fruits of the crime. In fact, the evidence is to the contrary. Specifically, for his own spot, which was presumably one of many in which the conspiracy dealt drugs, Ayala was required to pay rent of 5% of sales to Guzman. The source, Viejo, was entitled to 70% of sales. Of the remaining 25%, Soto was given between 5 and 10%. Of the remaining 15%, Ayala was required to pay the workers. At this rate, it does not appear that Ayala received a larger share of the profits of the Power Rules drug conspiracy than the actual leaders—who appeared to be Guzman and possibly Rivera. Based on the evidence offered by the Government, I cannot conclude by a preponderance of the evidence, or surely any higher standard, that an aggravating role adjustment is required.

### 3. Relevant Conduct

Since 1990, it is well established that a role adjustment may be based on uncharged relevant conduct. *See* Introductory Commentary to Chapter 3, Part B of the U.S.S.G. *See also United States v. Perdomo,* 927 F.2d 111, 116–17 (2d Cir. 1991); *United States v. Lanese,* 937 F.2d 54, 56 (2d Cir.1991); *United States v. Marino,* 29 F.3d 76, 77–78 (2d Cir.1994). Nonetheless, I decline to impose the role adjustment based on Ayala's relevant conduct. The only evidence of Ayala's leadership or managerial role in the Avenue St. John Boys drug conspiracy came from Luis Soto. While Soto only provided details of the structure of Ayala's drug operation on Avenue St. John prior to the time he joined forces with Guzman, his uncorroborated testimony is not sufficient for me to find, by clear and convincing evidence, that Ayala was a manager or leader. Soto is simply not a sufficiently reliable witness on which to support an adjustment of such importance and magnitude. Perez, in turn, testified generally that Ayala was the "boss" at Ayala's Hunts Point spot, and employed workers and a manager. Tr.2 at 52–53. His conclusions, however, were based on observation, not participation. In short, he had no first-hand knowledge of the internal workings of Ayala's Hunts Point drug spot.

I do not find, based on this testimony, that Ayala meets the indicia of leadership cited above under a clear and convincing standard. *See United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996) (with regard to upward adjustments) "the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond a reasonable doubt where appropriate." *See also United States v. Shonubi,* 103 F.3d 1085, 1089 (2d Cir.1997) (a standard more rigorous than a preponderance-of-the-evidence "should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly increase the sentence"); *United States v. Murgas,* 31 F.Supp.2d 245, 253 (N.D.N.Y.1998) ("In light of *Shonubi,* and given the dramatic impact of the departure sought, the court opts to apply a

higher burden of proof in the sentencing hearing.").

### D. Relevant Conduct: The Attempted Murder and Assault

The Government also asks the Court to consider evidence of an attempted murder and of an assault in setting the offense level.[4] Application Note 1 to § 2E1.1 states that "where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)." This Application Note would require grouping the assault and attempted murder separately if they are found to be relevant conduct with respect to any offense of conviction. See § 1B1.3(a)(2). Following the *Fatico* hearing, the Government submitted a letter suggesting that the violent acts should be grouped separately from the narcotics charges, and assigned an offense level of 30.[5]

■ Specifically, the Government offered evidence at the *Fatico* hearing that Ayala tried to kill Miguel Guzman, the leader of Power Rules. The Government has also offered evidence that Ayala shot Luis Soto in the shoulder. I conclude that the attempted murder and assault, even if proven, cannot be considered relevant conduct in setting the offense level for the racketeering charges. First, this is clearly uncharged conduct, as the only predicate acts charged against Ayala involved narcotics. However, evidence of uncharged acts may be considered as relevant conduct in some circumstances. As noted above, U.S.S.G. § 1B1.3(a)(1)-(4) sets forth the permissible boundaries of uncharged conduct. Typically, the burden of proof

for relevant conduct is preponderance of the evidence, not the higher clear and convincing standard. *United States v. Zagari*, 111 F.3d 307, 322 (1997) (citing *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997)).

This alleged conduct does not fall in any of the enumerated subcategories mentioned earlier. The offense of conviction, of course, concerns the enterprise known as Power Rules whose goals were to distribute narcotics, commit extortion in furtherance of that business, and engage in violent acts to protect that business. The conduct that the Government alleges should be considered as relevant conduct is antithetical to the purpose and goals of this enterprise. The indictment alleges that Power Rules sought to kill Ayala, in order to maintain control of certain drug spots. The evidence reveals that Ayala, at some point, had stopped paying Guzman for permitting him to sell drugs on Avenue St. John and Southern Boulevard. Indeed, one of the alleged goals of the conspiracy charged in the indictment and proved to the jury, was to murder Ayala, who was cast in the role of victim. If Ayala, in turn, defended himself by fighting back and attempting to kill the leader of Power Rules, this was not done during the commission of the offense, in preparation for the offense or for the purpose of avoiding detection for that offense. Similarly, if Ayala shot Soto as part of the ongoing war between Power Rules and the Avenue St. John boys, this could not have been done in furtherance of the goals of Power Rules.

---

4. In its September 11, 1998 letter, the Government argued that this conduct should be considered under U.S.S.G. § 1B1.4, which provides that a court may consider the background, character and conduct of the defendant when determining where within the guideline range to sentence a defendant or whether to give an upward departure. It now appears that the Government is also arguing that this evidence should be considered relevant conduct in setting the base offense level with respect to the racketeering convictions.

5. The Government concedes by making this request that the attempted murder and assault are not relevant conduct with respect to the narcotics counts. However, should the Court not consider these acts as relevant conduct with respect to the RICO counts, then the Government seeks an upward departure, claiming that these violent acts demonstrate that the defendant's criminal history category does not adequately reflect the seriousness of his criminal past. *See* pp. 136–37, *infra*.

Whether this conduct will be considered for purposes of an upward adjustment will be discussed next. Suffice it to say that this conduct does not fall within the definition of conduct relevant to the RICO counts of which Ayala was convicted and should not be considered in setting the base offense level.

### Departure Motions

"Although the Sentencing Guidelines were intended to create consistency in sentencing for 'offenders with similar histories, convicted of similar crimes, committed under similar circumstances,' they were not meant to eliminate all of the district court's discretion." *United States v. Adelman*, 168 F.3d 84, 86 (2d Cir.1999) (quoting *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). "[T]he Supreme Court explained that before a sentencing court departs downward, it must determine that aspects of the case are 'unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.'" *United States v. Galante*, 111 F.3d 1029, 1033 (2d Cir.1997) (quoting *Koon*, 518 U.S. at 98, 116 S.Ct. 2035). "After such consideration, if a district court decides to depart from the Guidelines, in most cases its decision will 'be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court.'" *Adelman*, 168 F.3d at 86–87 (quoting *Koon*, 518 U.S. at 98, 116 S.Ct. 2035).

### A. Upward Departure—Criminal History Enhancement

■ Mr. Ayala has no criminal history points. As a result he falls in Criminal History Category I. The Government asks that Ayala's criminal history category be increased pursuant to U.S.S.G. § 4A1.3, which states:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the

defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

*See also United States v. Ashley*, 141 F.3d 63, 69 (2d Cir.1998) (Guidelines authorize a departure where a defendant's criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that he will commit further crimes); *United States v. Rivers*, 50 F.3d 1126, 1131 (2d Cir.1995) (a sentencing judge should exercise discretion whenever she concludes that the criminal history calculation under-represents the seriousness of defendant's prior record).

The Government argues that a criminal history category at the lowest level does not adequately reflect the seriousness of the defendant's past criminal conduct. The Government argues that the enhancement is warranted based on the pending state court charges against Ayala. These charges result from the alleged shooting of Luis Soto. The Government further argues that the enhancement is warranted based on Ayala's attempts to murder Miguel Guzman.

Section 4A1.3 states that the term reliable information refers to information in a number of categories, which are a permissive but not exclusive list. The above incidents fall only in the last of this group, section (e), which is "prior similar adult criminal conduct not resulting in a criminal conviction." The defense argues that the term "prior" must mean "prior" to the acts that make up the "offense of conviction." The Government counters that "prior" means only "prior to sentencing". The Government has the better of this argument. *See United States v. Keats*, 937 F.2d 58, 66–67 (2d Cir.1991) (considering post-arrest criminal conduct, for which defendant was convicted but awaiting sentence, for purpose of § 4A1.3 enhancement). However, I conclude that this enhancement is not warranted.

The defense relies heavily on the language found in *Gigante,* 94 F.3d at 56, for the proposition that this additional conduct should be assessed by a standard of proof higher than a preponderance of the evidence. I agree. *Gigante* specifically teaches that the "reasonableness of substantial upward departures will depend in part on the standard of proof by which the conduct warranting the standard is established." *Id.* at 57.

Ayala has already had an offense level calculated pursuant to the concept of relevant conduct, and an upward adjustment for weapons possession, neither of which were the subject of proof at trial. These adjustments already result in an extremely high Guideline range. In seeking yet another adjustment based on uncharged conduct never considered by a jury and asking the Court to find that Ayala committed two additional crimes—one of which is now pending in New York State court—I conclude that the Government must prove these charges beyond a reasonable doubt. This, of course, is the same standard the jury will apply in state court. This standard of proof has not been met based on the evidence presented at the *Fatico* hearing. As a result, no upward adjustment based on this uncharged conduct can be sustained.

## B. Downward Departure—Extraordinary Family Circumstances

 Defendant's first request for a downward departure is based on extraordinary family circumstances pursuant to U.S.S.G. § 5K2.0. *See, e.g., United States v. Faria,* 161 F.3d 761, 762 (2d Cir.1998) ("we have upheld downward departures based on family circumstances 'where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.'") (quoting *United States v. Sprei,* 145 F.3d 528, 535 (2d Cir.1998)). Ayala's request for this departure is based on a combination of circumstances. First, Ayala, who is now 25, has been with the same woman for 12 years, since he was 13 years old. His common-law wife, Milady Mendez, is a 25-year old public assistance recipient, who has no education, job skills or experience. They have two children: a 4 year old boy, and an 8 year old girl, who suffers from Down's Syndrome. It should be noted that Ayala was 17 at the time his daughter was born, with no parents or grandparents of his own.

He was raised by his maternal grandmother—until her death when he was 14—because his teenage mother was on welfare and drugs and his father was in and out of jail. After his grandmother died, he returned to live with his mother. The defendant has been the sole emotional and financial support of this family. However, the Presentence Report ("PSR") notes that he has a 10th grade education and has only worked at odd jobs in the neighborhood. He has never filed a tax return. Nonetheless, neighbors, friends and relatives, as well as teachers and doctors, have written to the Court and confirmed that both children are very close to their father, and that the disabled child is particularly dependent on her father. All of those who wrote to the Court have stated that her condition has or will deteriorate further without the presence of her father. In addition, Ayala has taken care of his mother, a 40–year old public assistance recipient, who has a history of drug abuse, an incarcerated husband, and cannot read or write English. The PSR notes, however, that she does have three children living at home—Ayala's 26–year old brother Chris and two half-siblings, a boy and a girl, 18 and 17 years old respectively.

It is well established that family circumstances are ordinarily not relevant in sentencing. *See* § 5H1.6 ("Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range)." Nonetheless, this Circuit has recognized this ground for departure, where it is clearly established that the defendant is a unique source of financial and/or emotional support for a significant number of dependents. *See, e.g.,*

*United States v. Galante,* 111 F.3d 1029, 1037 (2d Cir.1997); *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991). Here, the defendant has demonstrated extraordinary family circumstances which are widely accepted as a valid reason for departure. *See United States v. DeRiggi,* 893 F.Supp. 171, 174 (E.D.N.Y.), *aff'd,* 72 F.3d 7 (1995).[6]

This case falls well within the precedent in this Circuit in which family circumstances have been held to be extraordinary. *See, e.g., DeRiggi,* 893 F.Supp. at 184 (child with severe emotional distress); *United States v. Rodriguez,* 94 CR 39, 1994 WL 381488 (S.D.N.Y. July 19, 1994) (diabetic child); *United States v. Vaughan,* 92 CR 575, 1993 WL 119704 (S.D.N.Y. April 15, 1993) (wife with Alzheimer's disease). Ayala's wife is uneducated and unemployed. It would be extremely difficult for her to financially support and care for her two young children, particularly where one is severely handicapped. This child, who has Down's Syndrome, will need care and attention throughout her entire life. A sentence within the Guideline range would therefore destroy this otherwise viable family unit.

The Government argues, somewhat convincingly, that while Ayala provided emotional support to his family, his financial support was provided solely from his illegal drug trafficking. In addition, the Government warns that he is a violent man who is not a credible role model for his children. There is a response to these arguments. First of all, such departures have repeatedly been given to drug dealers and to those who have engaged in violence. *See, e.g., Galante,* 111 F.3d at 1036 (2d Cir.1997); *United States v. Ramirez,* 792 F.Supp. 922 (E.D.N.Y.1992) (defendant cared for his three younger siblings, one of whom had Down's Syndrome).

In addition, after serving a lengthy prison term, Ayala will hopefully gain an education and learn a trade. If he is as committed to his family as he appears to be, he will be able to earn a legitimate living when he is released. He has demonstrated that he is a hard worker, enterprising, and it must be remembered that he is only 25 years old. He will therefore be able to provide emotional and financial support to his family upon his release. As to the violence, Ayala lived in the "kill or be killed" jungle of drug dealing. His victims or intended victims were the leaders of rival gangs who were attempting to kill him. He was prepared to defend himself and shoot back. There is no record of any gratuitous violence. He did not beat his wife or children, he did not attack strangers in the community, or prey on innocent victims. In short, removed from the drug environment in which he survived, there is no proof that he is a violent man. And, for good measure, it must be noted that other than allegedly shooting Soto in the shoulder, he is not responsible for any murders or assaults, unlike many of the members of the Power Rules gang.

Finally, the Government argues that due to the required statutory mandatory minimum sentence, Ayala will not be able to actually provide emotional or financial support for his family for at least ten years. This begs the question of whether a downward departure for family circumstances make sense when the beneficiaries will not be able to benefit for a significant period of time. At least one circuit court has approved a family circumstances departure in this situation. *See United States v. Owens,* 145 F.3d 923, 926 (7th Cir.1998) (court departed to ten year minimum where defendant took "an active role in raising his children and supporting his family"). Second, as noted earlier, unlike most young children, Ayala's daughter will never become a

---

6. This departure is for the benefit of the dependents not the defendant. *Johnson,* 964 F.2d at 129. The beneficiaries are "the dependent and vulnerable people to whom the defendant has demonstrated long-term financial and emotional commitments." *See United States v. Londono,* 76 F.3d 33, 36 (2d Cir.1996).

normal adult and will need his attention for her entire life. In addition, if his non-disabled 4–year old son is deprived of his father throughout his youth, there is a statistically provable greater likelihood that he, too, will end up in jail. *See* Fox Butterworth, *As Inmate Population Grows, So Does a Focus on Children*, N.Y. Times, ("having a parent behind bars is the factor that puts a child at greatest risk of becoming a juvenile delinquent and adult criminal").[7] *See* Exhibit A to Defendant's Sentencing Memorandum. Thus, no matter when he is released, Ayala's family will have an extraordinary need for his support.

The final factor to address when considering family circumstances is Ayala's onerous background. *See* U.S.S.G. § 1B1.4 ("the court may consider, without limitation, any information concerning the background, character and conduct of the defendant …").[8] Ayala comes from a poor drug infested neighborhood. In addition, his father and mother used drugs and his father has been in and out of prison throughout Ayala's life. Despite this background, he has remained committed to a nuclear family unit and has met all of his familial responsibilities in a truly extraordinary manner.[9] *See Ramirez*, 792 F.Supp. at 923. This is yet another reason that Ayala is entitled to a family circumstances departure.

## C. Downward Departure—Unique Combination of Circumstances

In the alternative, the defense seeks a downward departure, pursuant to U.S.S.G. § 5K2.0, for a unique combination of circumstances including: extraordinary family circumstances; multiple adjustments found by a preponderance of the evidence; the quantity of drugs fails to account for the quantity/time factor; extreme financial pressure; lack of sophistication; Congress' rejection of the Sentencing Commission's recommendation to eliminate or reduce the crack/powder cocaine sentencing disparity; and a straight Guidelines sentence will be disproportionate to that received by similar offenders nationwide. While this proposal was well presented, much of it is either inapplicable or inappropriate as a ground for a departure.

Family circumstances have already been addressed, as has the multiple adjustment issue. The drug quantities in which Ayala dealt were part of the offense of conviction and relevant conduct related to it. The only other upward adjustment was for the possession of a weapon in connection with that offense. The quantity/time factor is simply not applicable here—Ayala was not a street level drug dealer as in *United States v. Lara*, 47 F.3d 60, 62 (2d Cir. 1995). While it is true that Ayala had extreme financial pressures, it does not appear that he was unsophisticated in the sense of the defendant who was simply a middleman. *See United States v. Sanchez*, 925 F.Supp. 1004, 1013 (S.D.N.Y.1996). Ayala's gang had a structure of suppliers, managers and pitchers, a stash apartment and weapons. In addition, Ayala displayed the fruits of his drug dealing in the typical manner of owning a number of cars. This can hardly be viewed as unsophisticated. While the argument regarding the crack

---

7. It should be recalled that Ayala's father is currently in jail.

8. Note that Ayala's socio-economic status, lack of youthful guidance and disadvantaged upbringing do not qualify as independent departure grounds but merely highlight the extraordinary nature of his family circumstances. *See United States v. Payton*, 159 F.3d 49, 61 (2d Cir.1998) (sentencing judge is prohibited from considering defendant's lack of guidance as a youth as a basis for departure).

9. The concept that the baseline from which an individual's achievements should be measured was expressed by the Second Circuit in *United States v. Bryson*, 163 F.3d 742 (2d Cir.1998). In the context of a downward departure for extraordinary rehabilitation, the court stated: "Much depends on the baseline from which an individual's extraordinary rehabilitation can be measured." *Id.* at 748–49. This concept is equally applicable where a court is considering granting a downward departure for extraordinary family circumstances.

and powder cocaine disparity is creative and thoughtful, this is not the right case in which to consider it as Ayala's guideline range is set both by crack and heroin, and in such significant quantities that there is no danger that the disheartening disparity in the way crack and powder cocaine are considered will have an undue impact on this particular sentence. Finally, there is little risk, given the departure that has been awarded, that Ayala's ultimate sentence will be disproportionate to sentences for drug crimes (or other crimes) nationwide. An additional departure based on these grounds is, therefore, denied.

Having decided to grant a downward departure based on extraordinary family circumstances, the final question is determining the level of that departure. I conclude that an 8–level departure to 32 is warranted. Thus, his final guideline range at offense level 32, Criminal History Category I, is 121–151 months in custody.

### The Sentence

The following sentence is imposed: 151 months in custody, to be followed by a 5–year period of supervised release. This sentence is imposed on each of the four counts of conviction, to run concurrently. In addition, Mr. Ayala is required to pay a mandatory assessment of $400, which payment is due immediately. No fine is imposed, as defendant does not appear to be able to pay a fine nor does it appear likely that he will be able to pay a fine in the future. The mandatory drug testing condition is suspended due to the imposition of a special condition requiring drug treatment and testing.

Defendant is to be supervised in the district of his residence and the standard conditions of supervision as recommended by the Probation Department shall apply. The following mandatory conditions shall also apply: (1) defendant shall not commit another federal, state or local crime; (2) the defendant shall not illegally possess a controlled substance; and (3) the defendant shall not possess a firearm or other destructive device. The following special condition shall also apply: (1) defendant shall participate in a substance abuse program approved by the U.S. Probation Office, which may include testing to determine whether the defendant has reverted to the use of drugs and/or alcohol.

The reasons for this sentence can be quickly summarized. Ayala stands convicted of engaging in a racketeering enterprise, known as Power Rules, and conspiring with others engaged in that enterprise, to distribute crack and heroin. He is also convicted of distributing large quantities of both crack and heroin. These are very serious offenses and deserve serious punishment. Twelve and a half years in a jail cell is very serious punishment. This defendant is only 25 years old. Being deprived of his freedom for this lengthy period of time should serve the purposes of sentencing: to punish, to incapacitate and to rehabilitate.

Nonetheless, Ayala has at least one redeeming quality, his family. Despite difficult circumstances, Ayala has sustained a family unit for 12 years, since the age of 13. As noted earlier, he became a father at age 17. The first child he had is severely disabled with Down's Syndrome. Yet he and his wife have raised that child with unusual love and attention. He has also been a good father to his younger son. While he now has to pay the price for his criminal activities, I hope he will use his time in jail constructively by getting an education, helping others, and vowing that when he is released he will start his life anew and never again become involved with narcotics or guns.