**UNITED STATES of America**

v.

**Elvin FRANCIS, Defendant.**

**No. 98 CR. 606(RPP).**

United States District Court, S.D. New York.

Jan. 25, 2001.

Mary Jo White, United States Attorney for the Southern District of New York

City by Jay K. Musoff, Asst. U.S. Atty., for U.S.

Paul J. Madden, Brooklyn, NY, for Elvin Francis.

## OPINION

ROBERT P. PATTERSON, Jr., District Judge.

### Background

The issue before this Court is the sentence of Defendant Elvin Francis. Defendant was arrested on June 9, 1998 and charged with illegal reentry in violation of 8 U.S.C. § 1326. After an initial plea of not guilty, Defendant plead guilty on October 26, 1998 to the charged offense without a plea agreement. The Presentence Investigation Report, dated July 27, 1999 ("PSR"), calculates Defendant's Total Offense Level at 21 and his Criminal History Category as III, resulting in a sentencing range of 46 to 57 months. (PSR ¶¶ 21, 31, 53.) Defendant moves for a downward departure on two grounds: first, that the conditions of his pre-sentence confinement at Hudson County Correctional Center ("HCCC"), warrant a departure; and second, that the Criminal History Category of III overstates the seriousness and extent of his criminal history.[1]

At his October 26, 1998 appearance, Defendant, through his counsel, Paul Madden, Esq., first complained to the Court about being housed at HCCC. Defendant, an alien who requires an interpreter in

Spanish, had been held at HCCC since June 9, 1998. His counsel advised that Defendant perceived that his safety was threatened at HCCC. He complained of differential treatment by the guards and other inmates towards the federal inmates, and he alleged that he was the victim of an attempted slashing. In addition, he alleged that he was threatened and feared for his safety at HCCC. (Tr., 10/26/98, at 5, 16–17.) As a result, particularly in view of the alleged attempted slashing, this Court issued an order stating, "It is hereby ordered that the above named defendant is to be kept at a Federal Correctional Institution and not at Hudson County." (10/26/98 Order.)

The defense raised the issue of Defendant's safety again through letters to the Court, including several letters to the Court from Defendant, dated March 20, March 23, and August 24, 1999,[2] each of which were promptly docketed, placing the Government on notice of the continuing complaint, and a letter from counsel dated July 9, 1999. In addition to reiterating the safety concerns, counsel's motion letter raised a number of other problems Defendant was experiencing at HCCC, including: overcrowding; unsanitary conditions; inadequate bathroom facilities; inadequate medical attention; limited recreation; restricted family and counsel visits; no access to Spanish reading materials; and poor treatment due to his status as a federal inmate. (Letter from Madden, 07/09/99, at 3–5.) In summary, defense

---

1. Defendant originally raised six reasons to justify a departure: (1) his uncredited incarceration; (2) his criminal history category significantly overstates the seriousness of his prior criminal history; (3) the non-violent nature of his criminal past; (4) the conditions of his pre-sentence confinement; (5) the government's conduct; and (6) his willingness to waive deportation proceedings. (Letter from Madden, dated 07/09/99, at 1–2.) This opinion will address the issues of Defendant's criminal history and the conditions of his confinement at HCCC. The remaining reasons offered for departure have either been withdrawn by Defendant, previously denied by this Court, or do not merit departure.

2. The letters were signed by Defendant but were written in English. Defendant does not write or speak English, only Spanish. In a later court proceeding, Defendant explained that a fellow inmate wrote the letters for him because he could not communicate in English. Defendant acknowledged that he did not know the exact content of the letters, but expressed that he intended them to relay his concerns about HCCC to the Court. (Tr., 02/10/00, at 46–49.) For this reason, the Court will not consider the content of the letters in addressing Defendant's motions for departure, although the letters do seem to corroborate many of the allegations made by Defendant.

counsel noted, "Mr. Francis has suffered a great deal and he has been under much stress since being at the Hudson facility.... [H]e has lost about twenty pounds[,] ... lives in fear and feels ten years older." (*Id.* at 4.)

As of July 29, 1999, the next time Defendant appeared in this Court, he was still being housed at HCCC, despite this Court's order of transfer issued on October 26, 1998, nine months prior. At the appearance, the defense and Government offered different reasons why the Marshals Service or the Bureau of Prisons had still not obeyed this Court's Order. This Court ordered a hearing on the issue of the conditions of confinement at HCCC, which Defendant was subject to from June 9, 1998 until the Marshals finally transferred him on July 29, 1999. In total, Defendant spent approximately thirteen and one half months at HCCC.

**Discussion**

*I. Conditions of Confinement*

■ The issue of whether a sentencing judge may grant a downward departure based on the conditions of an inmate's presentence confinement is one on which the Second Circuit has not yet ruled. *See United States v. Gutierrez,* No. 99–1594, 2000 WL 1370326, at *1 (2d Cir. Sept. 20, 2000) (finding that the district court did not abuse its discretion in declining to depart based on conditions of confinement and, therefore, declining to decide whether such a departure is allowed under the Guidelines); *United States v. Londono–Jimenez,* No. 99 CR. 81–01(RWS), 2000 WL 1593381, at *6 (S.D.N.Y. Oct. 25, 2000) ("It is an open question in this circuit whether a departure could be granted on these grounds."). A number of district courts, however, many in the Southern District of New York and in the District of New Jersey, have addressed the issue of whether a departure on these grounds is permissible. A brief survey of these cases reveals that no clear consensus exists. At least one court has found that a judge does

not have the authority under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to depart based on the conditions of pretrial confinement. *See United States v. Booher,* 962 F.Supp. 629, 635–36 (D.N.J.1997), (finding that a downward departure is not the appropriate way to address inferior conditions of confinement), *rev'd,* 159 F.3d 1353 (3d Cir.1998). A number of courts have found that a judge does have the authority under the U.S.S.G. to depart based on the conditions of pretrial confinement. *See United States v. Brinton,* 139 F.3d 718, 725 (1998), (noting that the district court granted a downward departure based on 'conditions of confinement but declining to decide if that was an abuse of discretion), *overruled on other grounds by United States v. Nordby,* 225 F.3d 1053 (9th Cir.2000); *United States v. Hernandez–Santiago,* 92 F.3d 97, 101 n. 2 (2d Cir.1996) (noting that the district court granted a downward departure of three levels based on defendant's twenty-two months incarceration in a state facility, which was a "'harsher incarceration'"); *United States v. Sutton,* 973 F.Supp. 488, 492 (D.N.J.1997) (holding that, "a sentencing court is not foreclosed as a matter of law from considering the conditions of pre-trial confinement as a possible basis for departing downward," although it declined to do so); *United States v. Navarro,* Crim. No. 93–588–14(JCL) (D.N.J. Nov. 18, 1996) (cited in *Sutton* ) (granting downward departure for pretrial conditions of confinement); *United States v. Insuasti,* Crim. No. 96–73–3(DRD) (D.N.J.) (cited in *Sutton* ) (same); *cf. United States v. Bakeas,* 987 F.Supp. 44, 50 (D.Mass.1997) (holding that a "downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate"). A majority of the courts to consider a departure based on the conditions of confinement have sidestepped the issue by finding that, even if authority to depart exists, such a departure is not appropriate based on the particular facts

of the case.[3] *See United States v. Cazar,* No. 98 Cr. 1059(BSJ) (S.D.N.Y. Dec. 5, 2000) (declining to depart based on insufficient facts in particular case); *U.S. v. Londono–Jimenez,* No. 99 CR. 81–01(RWS), 2000 WL 1593381, at *6 (S.D.N.Y. Oct. 25, 2000) ("Assuming arguendo that it could be, however, the conditions of Londono–Jimenez's confinement, while not unproblematic, do not reach a level which would warrant a downward departure."); *United States v. Tavares–Pepin,* No. 94 Cr. 766(LAP) (S.D.N.Y. Oct. 17, 2000) (declining to depart based on insufficient facts in particular case); *United States v. Ruiz,* No. S15 97 Cr. 355–59(KMW) (S.D.N.Y. Aug. 2, 2000) (same); *United States v. Olaya–Rodriguez,* No. 98 Cr. 707(AGS) (S.D.N.Y. May 19, 2000) (same); *United States v. Galindo–Perez,* 99 Cr. 122(MBM) (S.D.N.Y. Nov. 9, 1999) (same); *United States v. Cabrera–Delgado,* 98 Cr. 1201 (S.D.N.Y. Oct. 18, 1999) (same); *United States v. Miranda,* 979 F.Supp. 1040, 1044–45 (D.N.J.1997) (declining to depart based on short length confinement). Because no clear consensus exists as to the propriety of granting a downward departure for conditions of pretrial confinement, this Court will first address the legality of such a departure under the Guidelines and then make a finding based on the particular facts of this case.

### A. The Legality of a Downward Departure Based on the Conditions of Pretrial Confinement

The United States Sentencing Commission ("Commission"), created by Congress pursuant to the Sentencing Reform Act of 1984, developed the Guidelines to create uniformity in sentencing. Despite the goal of uniformity, the Guidelines allow for a sentencing judge to exercise discretion and depart from the suggested range in appro-

priate cases. U.S. Sentencing Guidelines Manual § 5K2.0 (1998) states:

> Under 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." ... The decision as to whether and to what extent departure is warranted rests with the sentencing court on a case-specific basis.

"To determine whether a circumstance was adequately taken into consideration by the Commission, Congress instructed courts to 'consider only the sentencing guidelines, policy statement, and official commentary of the Sentencing Commission.'" *Koon v. United States,* 518 U.S. 81, 92–93, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (quoting 1 U.S.C. § 3553(b)). In deciding whether or not to depart from the Guideline range for a particular reason, the court must analyze whether the factor is one forbidden, encouraged, discouraged, or unmentioned in the Guidelines as a reason for departure. *See id.* at 95–96, 116 S.Ct. 2035 (adopting the four factor analysis of *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)). *Koon,* the Supreme Court precedent on departures, further states:

> If a factor is unmentioned in the Guidelines, the court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," [*Rivera* ], decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based

---

**3.** The record reflects that, of the judges in the Southern District who have declined to depart on the basis of the conditions of confinement, none, save Judge Mukasey in *Galindo–Perez,* conducted a fact-finding hearing. Furthermore, the judges declined to depart not

because they found that they lacked the authority to do so, but because the record before them did not demonstrate sufficient facts to warrant a departure for the defendant involved.

on grounds not mentioned in the Guidelines will be "highly infrequent." 1995 U.S.S.G. ch. 1, pt. A, p. 6.

*Koon*, 518 U.S. at 96, 116 S.Ct. 2035.

Although departures based on conditions of confinement are not encouraged by the Guidelines, they also are not discouraged; in fact, conditions of confinement is an unmentioned factor. This Court finds no evidence to indicate that the Sentencing Commission took the conditions of a presentence detainee's confinement into account in creating the Guidelines. No evidence exists to show that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities except for federal facilities. To the extent that the Commission may have assumed that federal pre-sentence detainees might be kept in state or county facilities, as the Government suggests based on statistics and historical practice,[4] no evidence exists that they contemplated that these facilities would be qualitatively different than federal facilities. Therefore, conditions of confinement below those in federal institutions provide grounds for a departure under U.S.S.G. § 5K2.0. *See United States v. Sutton*, 973 F.Supp. 488, 491–95 (D.N.J.1997).

### B. Whether the Facts of this Particular Case Warrant a Departure

 Compared to a regular sentencing proceeding, a lengthy record is before the Court. In total, this Court held four hearings on this issue, with a total of seven transcripts of witnesses, and received testimony from other proceedings relating to the conditions of confinement at HCCC. Both sides submitted numerous exhibits and wrote multiple motion letters addressing the issue. Although the legal precedent for departure on this issue is mixed, an extensive and detailed factual record exists. Because Defendant was subjected to conditions at HCCC that were qualitatively worse than conditions at a federal correctional facility, both particularly and generally, Defendant's motion for a downward departure is granted.

Five witnesses testified for the defense and supported the allegations of substandard conditions at Hudson: Elvin Francis, Defendant (Tr., 02/10/00, at 3–70); Rosalina Madeline Ramirez, Defendant's wife (Tr., 02/10/00, at 71–74); Norman Reimer, Esq., defense attorney (Tr., 05/23/00, at 3–74); Frederick Cohn, Esq., defense attorney (Tr., 11/20/00, at 2–35); and Reynaldo Caban, former HCCC inmate (Tr., 12/14/00, at 25–114). James Nieves, a HCCC federal liaison officer (Tr., 02/10/00, at 86–130; Tr., 02/29/00, at 140–201), and Kelvin Roberts, a Lieutenant at HCCC (Tr., 02/29/00, at 201–246), testified for the Government.

Defendant testified to a number of specific problems with HCCC. Some complaints were more minor, including: inadequate commissary (Tr., 02/10/00, at 7); and inadequate television and recreation (*id.* at 25–26, 61–62). Other complaints related to the well being of inmates: overcrowding in the initial intake cells (*id.* at 6–8); inadequate hygiene (*id.* at 8–9); a lack of Spanish reading materials (*id.* at 26–27); multiple problems with visits (*id.* at 33–36); and a lack of programs or work opportunities (*id.* at 40–41). Finally, some complaints related to the very safety and health of

---

4. In their Memorandum of Law in Opposition to Defendant's Motion (hereinafter, "Gov't's Mem. in Opp."), the Government argues that the Commission must have contemplated conditions of confinement in non-federal facilities based on the historical and statistical evidence that this practice has occurred for some time. (Gov't's Mem. in Opp. at 6–10.) Although the Government cites legislative history, cases, and reports that support its contention that federal inmates have historically been housed in non-federal facilities, the Government's evidence still does not support the claim that the Commission contemplated the conditions of confinement when they developed the Guidelines. Furthermore, because the Government's cited evidence is not within the Guidelines, policy statements, or commentary, this Court cannot properly consider it in determining whether or not the Commission contemplated this factor. *See Koon*, 518 U.S. at 92–93, 116 S.Ct. 2035.

inmates, including: spoiled, unsanitary food that did not meet basic nutritional needs (*id.* at 28–30); theft of personal property (*id.* at 30–33); an inmate attempted to stab Defendant (*id.* at 9, 12–15); Defendant lost twenty to twenty-five pounds while at HCCC (*id.* at 9–10, 39–40); weapons were prevalent among inmates (*id.* at 10); gangs were rampant throughout the institution, and supervision of the gangs was virtually nonexistent (*id.* at 10–15); specifically, the gangs controlled the phones and would not let other inmates use the phones freely (*id.* at 19–20); federal and states inmates mingled together, except in assigned cells (*id.* at 15, 18, 22–23); and Defendant was threatened by other inmates (*id.* at 9, 30–32). In addition to explaining the problems with HCCC, Defendant testified to the different and better conditions at other federal facilities, specifically the Metropolitan Correctional Center ("MCC") and Otisville. (*Id.* at 11; *see also* comparisons throughout testimony). Overall, Defendant's stay at HCCC led to physical and psychological problems, specifically, physical attacks, significant weight loss, stress, depression, insomnia, and fear. (*Id.* at 36–40; Def. Ex. A (Defendant's medical records at HCCC).) Defendant's wife corroborated his claims of weight loss and depression. (*Id.* at 73–74.) The medical records corroborate his claims of weight loss, stress, depression, and insomnia. (Def. Ex. A.) Although Defendant never reported the alleged attempted slashing to prison officials at HCCC, he did report it to his family, his attorney, this Court, and the Marshals. Defendant maintains that he did not file a grievance report about the stabbing because he feared it would result in trouble for him. (Tr., 02/10/00, at 12–15, 55–58 (Q: "And you never filed a complaint or a grievance about the stabbing, did you?" A: "No, sir, no. It would get me into trouble. It would hurt me." *Id.* at 58.).)

Reynaldo Caban, a former HCCC inmate who was confined in HCCC, in the same unit as Defendant, during the same period as Defendant but for a lesser time, verified many of Defendant's claims. (Tr., 12/14/01, at 28, 34–35, 41, 75.) Caban testified to the rampant gang activity at HCCC and stated that he observed gang "colors, groups, hand signs and intimidation, extortion, robberies, violence, fights. Like a war." (*Id.* at 30, 29–43.) Caban confirmed Defendant's claim that the prison staff did not control the obvious ongoing gang activity. (*Id.* at 33–34, 53–62.) Caban also verified Defendant's account that gangs controlled access to the phones. (*Id.* at 41–43.)

In addition to gang activity, Caban testified that the staff did not act to maintain safe and secure conditions at HCCC. (*Id.* at 34–62.) One example Caban offered was how guards would allow inmates to fight, without staff interference or discipline, while other inmates formed a circle around them. (*Id.* at 37–38, 50–52.) Caban's testimony also supported Defendant's allegations that the officials did not segregate federal and state inmates, who frequently had problems interacting with each other (*id.* at 35–36), that HCCC had poor quality of food (*id.* at 66–67), and that the facility had extremely poor sanitation (*id.* at 67–68). Furthermore, Caban's testimony supported the general description of the atmosphere at HCCC as a dangerous one of frequent violence, weapons, and fights. (*Id.* at 55–64.) When asked if he reported the fighting, Caban responded, "The police watched us fight, so what kind of report? They watching it." (*Id.* at 60.) Finally, in comparing HCCC to other federal institutions in which he had been housed, specifically, the MCC, the Metropolitan Detention Center ("MDC"), and Otisville, Caban rated HCCC the worst in security by the officers, level of violence, and level of stress. (*Id.* at 49–50, 63–64.)

Norman Reimer and Frederick Cohn, two criminal defense attorneys with clients who were housed at HCCC during the same time frame as Defendant, also testi-

fied.[5] Reimer, who had four federal clients, including Caban, confined at HCCC during the relevant time period, testified that his clients reported numerous problems while housed at HCCC, including: weight loss; filthy, unsanitary conditions; lack of safety; lack of supervision; gang violence; inmate fighting; and threats. (Tr., 05/23/00, at 21–66.) Cohn, who had three federal client housed at HCCC during the relevant time period, also reported that his client had numerous problems at HCCC, including: one client was assaulted twice, including one stabbing; inmates extorted money and food; gang activity; and low security. (Tr., 11/20/00, at 3–35.) The testimony of these attorneys is helpful for two reasons. First, some of the accounts allege the same complaints that Defendant alleges. Second, the complaints, though not necessarily identical to the complaints made by Defendant, lend credence to Defendant's overall credibility in his claim that HCCC was a facility with high levels of violence and little security from the staff. Overall, this Court finds all of the defense witnesses credible.

The Government offered two witnesses: James Nieves and Kelvin Roberts. Although this Court declines to find that these witness were not credible, it notes that these witnesses did not display any firsthand knowledge of conditions at HCCC, other than how things were supposed to operate in the prison. Neither of these witnesses had any regular, direct contact with the prison staff, facilities, or inmates as they relates to federal inmates.

Nieves's testimony consisted of an overview of the basic procedures at HCCC. (Tr., 02/10/00, at 88–130.) He maintained that he has received no complaints about HCCC from federal inmates. (*Id.* at 89–94.) On his direct testimony, Nieves specifically contradicted some of the complaints made by Defendant. Specifically, he testified to the intake procedures (*id.* at 88–105), the television area (*id.* at 106–07), the recreation facilities (*id.* at 110–11), the library and its abundance of Spanish materials (*id.* at 111–12), the .visitation procedure (*id.* at 112–14), the sanitary upkeep (*id.* at 115), and the existence of procedures to combat gang activity (*id.* at 116–21). Under questions from the Court and on cross examination, however, it was evident that Nieves's knowledge of HCCC was limited not to the actual state of affairs, but to the ideal state of affairs as is outlined in the procedures. (Tr., 02/29/00, at 143–199.) He admitted that he has nothing to do with the daily administration of most tasks "unless there's a problem." (*Id.* at 149–51.) (In response to the Court's question, "So, you're just testifying about what's supposed to happen, is that right?" Nieves responded, "Correct, sir." *Id.* at 151.) Overall, Nieves displayed little personal knowledge of the conditions and procedures at HCCC of which Defendant complained. In addition, Nieves's credibility was twice impeached when defense counsel exposed contradictory answers given by him in a prior proceeding before another judge. (*Id.* at 145–148; 198–200.)

Roberts, a HCCC lieutenant whose focus is on the intelligence unit that monitors gang activity, also testified. Although Roberts acknowledged that some gang members are housed in HCCC (*id.* at 203), he testified that there was no gang related violence in HCCC in 1998 or 1999 (*id.* at 202–05). In response to the question, "And how frequent is any type of violent incident involving gangs at Hudson County?" Roberts answered, "Well, the gangs at Hudson—Hudson County is basically, we have as far as violent part of the gang· is zero. It's none." (*Id.* at 203.) Appar-

---

5. The Government repeatedly objected to the testimony of these attorneys as unverifiable hearsay. The Court notes that it is not bound by the rules of evidence in sentencing proceedings, and hearsay evidence is admissible. Furthermore, the Government regularly relies on hearsay evidence in sentencing proceedings, and no reason exists that the defense cannot also do so.

ently, this is the result of the director's "zero tolerance policy" toward gangs. (*Id.* at 202 ("[T]he director has a zero tolerance policy where he does not recognize gangs.").) Roberts also specifically denied Defendant's allegation that gangs controlled telephone access. (*Id.* at 211.) Roberts also testified to the "varied range of different programs" available to all inmates at HCCC, although such programs are not within his job description or responsibilities. (*Id.* at 206.) Finally, Roberts testified to the procedures for segregating gang members and the security measures the staff employs. (*Id.* at 206–211.) Like Nieves, Roberts demonstrated little personal knowledge of the matters to which he testified, and he admitted that his information relied on informal conversations with other people. (*Id.* at 216–19.) Although he testified that he is the officer with the primary responsibility for controlling gang activity in HCCC, Roberts, like Nieves, provided only an administrative perspective and had little personal knowledge of the actual operations at HCCC. In addition, the testimonies of Roberts and Nieves were contradictory in some ways.

Based on the evidence considered as a whole, this Court finds that Defendant was subjected to extraordinary stress and fear while housed at HCCC. According to multiple witnesses, certain aspects of the facility were virtually controlled by gangs and inmates, without effective supervision from staff. In addition to the psychological pressure, this Defendant was the victim of an attempted attack and threats. He suffered significant weight loss, stress, insomnia, depression, and fear as a result. In addition, the Court notes that HCCC was operating at 150% capacity. (Letter from Musoff, dated 08/02/99, Ex. B); Tr., 02/29/00, at 133–135. The evidence supports a finding that the thirteen and a half months that Defendant served at HCCC were under qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons. This Court finds, therefore, that a downward departure is warranted.

Contrary to the Government's argument that granting a motion for a downward departure based on the conditions of confinement is simply judicially-imposed prison reform and is, therefore, inappropriate, this Court is under no illusion that this departure for a single defendant will aid prison reform, nor is it the desire or role of this Court to do so. Rather, the departure is warranted because Defendant experienced extraordinary stress and fear for his safety, due to his being placed for thirteen and one-half months in an institution in which the conditions of confinement were below the conditions of confinement in federal institutions. While at HCCC, Defendant was the victim of an attempted knife slashing by another inmate and observed frequent fights between inmates; he was threatened by other inmates and gangs; the gang control of the telephones was a constant reminder of his insecurity; he was also denied access to a library with Spanish materials—the only kind that he could read; the visitation procedure sometimes denied him contact visits with his family and thrice denied him any type of visit at all; counsel visits were unusually complicated; he lost approximately twenty pounds and had insomnia; and he was forced to live in the overcrowded situation of a prison operating at 150% of its capacity, with the daily stress and fear as a result of the overall lack of security and the presence of gangs. Had the Bureau of Prisons or the Marshals Service obeyed this Court's October 26, 1998 Order and transferred Defendant to a facility that complied with federal standards, a departure would not be necessary.

A departure is warranted to acknowledge the qualitatively different, substandard conditions to which Defendant was subjected for an extended period, i.e., his thirteen and one-half months stay at HCCC. As Judge Debevoise observed in *United States v. Insuasti*, a departure on these grounds may cause federal officials knowledgeable about prison conditions to

monitor the conditions of pretrial detainees. *See United States v. Sutton,* 973 F.Supp. 488, 491 (D.N.J.1997) ("Judge Debevoise further reasoned that granting a downward departure would have the salutory effect of 'emphasizing to government officials the necessity of addressing conditions in the Union County Jail.'" (quoting Cody Cert. Ex. C, *United States v. Insuasti,* Criminal Judgment.).)

## II. Criminal History Category

■ Defendant also moves for a downward departure pursuant to U.S.S.G. § 4A1.3, arguing that the Criminal History Category III significantly overstates the seriousness of Defendant's history.[6] Defendant notes that, of the six points in his criminal history calculation, one was for a state misdemeanor for possession of marijuana, a crime that resulted in a sentence of time served one day after he was arrested, and two points were for the commission while on parole of the instant offense (illegal reentry). (PSR ¶¶ 24-31.) Although this Court agrees that the addition of one point for a minor offense for which Defendant received a sentence of time served may overstate the seriousness of Defendant's criminal history, this Court does not find that the points included for the parole violation overstate Defendant's history. Criminal History Category III has a point range of four to six, whereas II has a point range of two to three. Even disregarding the marijuana conviction, Defendant still has five points and, thus, has a Criminal History Category of III. The Court declines to depart on this basis.

## Conclusion

Based on the reasoning above, Defendant's motion for a downward departure

6. U.S.S.G. § 4A1.3 states in part:
 There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. An example might include the case of a defendant with two minor misdemeanor convictions close to

based on the conditions of confinement at HCCC is granted. This Court reduces the applicable Guideline range by one step, to 41 to 51 months.

IT IS SO ORDERED.

ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period. The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category (Category II), and therefore consider a downward departure from the guidelines.