**UNITED STATES of America**

v.

**Jublequis MATEO, Defendant.**

**No. 02 CR. 668(VM).**

United States District Court,
S.D. New York.

Jan. 9, 2004.

## DECISION AND ORDER

MARRERO, District Judge.

Defendant Jubelequis Mateo ("Mateo") pled guilty before this Court to conspiring to distribute heroin. She now moves the Court to adjust downward the base level offense under the Sentencing Guidelines because she played only a minor role in the offense. She also moves the Court to depart downwardly from the otherwise applicable sentencing range because, among other reasons, she has suffered from harsh pre-sentence confinement conditions and has extraordinary family circumstances. For the reasons stated, Mateo's motion is granted in part and denied in part.

## I. BACKGROUND [1]

Mateo, age 22, came to the United States from the Dominican Republic in 2001, hoping to be able to earn enough money to provide for her daughter Arianni, whom she left in the care of her mother (Arianni's grandmother) in the Dominican Republic. Arianni's father has a long history of physically abusing Mateo and is no longer involved in Arianni's upbringing.

Mateo found work as a waitress in New Jersey. One night after work, she attended a party at which she was raped and became pregnant. During this time, Mateo met a drug supplier who learned that Mateo had financial problems. Mateo's involvement with this supplier led to the

---

[1]. The factual summary derives from (1) the Presentence Investigation Report, dated March 21, 2003; (2) letters from Mateo's attorney, dated June 9, 2003 and September 26, 2003; (3) letters from the Government dated July 7, 2003 and December 11, 2003, and (4) the testimony and evidence submitted at a sentencing hearing on December 12, 2003. The Court will not cite these sources further.

conviction at issue here. In early 2002, Mateo attempted to broker two large heroin transactions by providing drug samples on behalf of the supplier to persons who had called her seeking to buy two kilograms of heroin. In the first transaction, Mateo arrived with her supplier at the agreed-upon delivery point, but the buyer declined to meet her. Authorities arrested Mateo in March 2002, before the second transaction was complete. The first potential buyer was a confidential government source, the second an undercover government agent.

Following her arrest, Mateo was first incarcerated at the Metropolitan Detention Center in Brooklyn (the "MDC"), where she stayed in an "open unit" with around 100 other inmates. At that time, Mateo was approximately six weeks pregnant. From then through October 2002, Mateo received regular pregnancy-related care at the MDC and on occasion at medical facilities outside prison. On October 30, 2002, she complained of contractions and was examined by MDC medical staff, who noted that Mateo showed no signs of labor and estimated her date of delivery to be around November 25, 2002. She was returned to her housing unit.

At around 3:00 a.m. on November 5, 2002, Mateo awoke with labor pains. Another inmate, Wendy Castro Fernandez ("Fernandez"), notified the guard that Mateo was in labor, but he told her that Mateo would have to wait until 6:00 a.m. for the physician's assistant (the "PA") to arrive. According to Fernandez, at 6:00 a.m. she again asked the guard for help, but he told her she would have to wait longer. At around 8:00 a.m., after the guards had changed shifts, Fernandez alerted the new guard on duty that Mateo was in labor. The PA on duty appeared sometime between 10:00 a.m. and 11:00 a.m., but left without fully examining Ma-

teo. He apparently concluded that, since Mateo's due date was not until November 25, she could not have been in labor.

During the balance of that day, other inmates alerted the authorities on Mateo's behalf, but she was not moved out of the open unit until sometime between 4:00 p.m. and 5:00 p.m., at which point she was transferred to the medical unit. The PA finally called the emergency service for an ambulance sometime around 6:30 p.m. when it became apparent that Mateo was about to give birth. A team of Emergency Medical Technicians arrived shortly thereafter and noticed that, even though Mateo was "crowning" (the baby's head had begun to emerge), she was still wearing her underwear. Mateo gave birth while laying on an upright stretcher in the MDC at 6:53 p.m., without the benefit of pain relief or other medication. Mateo's sister Maritza, who lives in Boston, Massachusetts, now cares for the child, a boy named Johan.

Maritza's husband objected to her assuming custody of Johan, and he has since abandoned Maritza. Maritza reports extreme financial difficulty in raising Johan alone. Mateo's mother, Josephina Medina ("Medina"), also reports extreme difficulty in raising Arianni alone in the Dominican Republic. Medina suffers from high blood pressure and poor vision.

On February 28, 2003, an MDC corrections officer accused Mateo and her cellmate of smoking in their cells. The women denied the allegation. The officer threatened to file a report, unless the women would undress in front of him. They complied. The officer returned the next day, March 1, and again requested the women undress in front of him. They refused, and filed a formal complaint against the officer.

Mateo reports being depressed and has seen a prison psychiatrist several times. Psychiatric records indicate she was seen

for symptoms of post traumatic stress disorder, anxiety, depression, low self-esteem, insomnia and substance abuse. Shortly after the sexual harassment incident, Mateo was briefly placed on suicide watch.

## II.  *DISCUSSION*

### A.  *APPLICABLE GUIDELINES*

■ As a general rule, the Court must use the Sentencing Guidelines Manual in effect at the date of sentencing. *See* 18 U.S.C. 3553(a)(4)(A)(ii); *see also United States Sentencing Guidelines Manual* § 1B1.11 (2002) ("U.S.S.G."). However, "where application of the Guidelines in effect at sentencing would result in a more severe sentence than the version in effect at the time of the commission of the offense," the application of the newer guidelines would violate the Ex Post Facto Clause of the Constitution. *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995). In such cases, "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1). "When an amended version of a guideline represents only a clarification by the Sentencing Commission of the original version rather than a substantive change," there is no Ex Post Facto problem and "the amended version is to be applied." *United States v. Gonzalez*, 281 F.3d 38, 46 (2d Cir.2002).

■ After the Probation Department prepared its Presentence Investigation Report, and after the parties had briefed the issues here, the Sentencing Commission issued emergency revised guidelines effective October 27, 2003, pursuant to the recently-enacted PROTECT Act, Pub.L. 108–21, 117 Stat 650 (2003). *See* 68 Fed. Reg. 60154 (Oct. 21, 2003). Those revisions might result in a more severe sentence for Mateo in at least two ways. First, the revisions prohibit combining so-called "considered" and "unconsidered" factors in awarding a downward departure based on multiple circumstances. *Id.* at 60155 (amending § 5K2.0(c)(2)(B)). Mateo has urged the Court to make just such a multiple circumstances departure. Second, the revision "further restricts family ties departures by adding an application note that establishes heightened criteria for departures based on loss of caretaking or financial support." *Id.* at 60175 (amending § 5H1.6). Mateo has moved the Court to make a departure based on the fact that her two young children will be deprived of her financial support and caretaking. Because the Sentencing Commission has indicated that this revision establishes "*heightened* criteria," *id.* (emphasis added), the Court concludes that it is not merely a clarifying amendment and that it would pose an Ex Post Facto problem as applied to Mateo. Therefore, the Court will apply the 2001 Sentencing Guidelines, which were in effect at the time of the crimes charged.[2]

### B.  *MINOR PARTICIPANT ADJUSTMENT*

■ Mateo seeks a two-point downward adjustment as a "minor participant" under U.S.S.G. § 3B1.2(b), which applies whenever the defendant proves by a preponderance of the evidence that she is less culpable "as compared to the average participant in such a crime." *United States v. Carpenter*, 252 F.3d 230, 235 (2d Cir.2001) (quoting *United States v. Rahman*, 189 F.3d 88, 159 (2d Cir.1999)). In a drug conspiracy case such as this one, the Court must evaluate "the nature of the defen-

---

**2.** Accordingly, all future references to the "U.S.S.G." shall be to the 2001 version, un- less otherwise noted.

dant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir.1990). This is a highly fact-specific inquiry in which the "dispositive consideration" is the defendant's " 'culpability in the context of the facts of the case.' " *United States v. Pena*, 33 F.3d 2, 3 (2d Cir.1994) (quoting *Garcia*, 920 F.2d at 155).

Mateo characterizes her role as an uninformed intermediary. She had no control over any aspects of the operation, nor did she manage any other participants. Her only role was to insulate the supplier from apprehension, and she knew only one other person involved, the supplier.

The Government responds that Mateo should be considered a "steerer," or a person who "direct[s] buyers to sellers in circumstances in which the sellers attempt to conceal themselves from casual observation." *United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir.1989). The Government relies on the holding in *Colon* that a " 'steerer' cannot be considered a 'minimal participant' " in a typical drug transaction. *Id.*

The Court agrees that Mateo fits the definition of a "steerer," but the holding in *Colon* applies only to the four-level reduction for "minimal" participation under U.S.S.G. § 3B1.2(a), which is distinct from, and much more rare than, the two-level reduction for "minor" participation under § 3B1.2(b). *See United States v. Lopez*, 937 F.2d 716, 728 (2d. Cir.1991) ("[T]he difference under the Guidelines between 'minimal' and 'minor' is not just semantic; rather, both are terms of art that result in different adjustments."). The *Colon* panel explicitly declined to consider whether the defendant was a minor participant. *Colon*,

884 F.2d at 1552. In *Lopez*, which the Government also cites, the district court had awarded a defendant a minor participation adjustment under circumstances less persuasive than the present case. That defendant "knew of the plan to sell 50 kilograms of cocaine; he traveled from Miami to New York to help with the transaction; and ... expected a large payment for his services." *See Lopez*, 937 F.2d at 727.

In determining whether Mateo's role was minor, the Court finds particular guidance from Judge Sheindlin's opinion in *United States v. Sanchez*, which awarded a minor participant adjustment to a "middleman" who brokered a 12–kilogram cocaine deal for a $6,000 fee. 925 F.Supp. 1004, 1010–14 (S.D.N.Y.), *aff'd*, *United States v. Chalarca*, 95 F.3d 239 (2d Cir.1996). First, regarding the "nature of the defendant's relationship to other participants," *Garcia*, 920 F.2d at 155, the Court notes that, just as in *Sanchez*, there is no evidence that Mateo had any regular or involved relationship with the larger drug organization. 925 F.Supp. at 1012. She apparently had only brief dealings with the one supplier. Second, regarding the "importance of the defendant's actions to the success of the venture," *Garcia*, 920 F.2d at 155, the Court agrees with Mateo that her role as an "intermediary" is relatively unimportant. The key players were the supplier (and his suppliers) and the buyer. Mateo, acting essentially a shield for the seller, was replaceable. *See Sanchez*, 925 F.Supp. at 1013 (characterizing defendant as "replaceable"). Third, regarding "the defendant's awareness of the nature and scope of the criminal enterprise," *Garcia*, 920 F.2d at 155, Mateo did not know the ultimate source of the drugs, nor any details about the operation of the conspiracy. She did not actually handle any drugs, other than the small samples, nor did she

appear to have any power within the drug conspiracy.

Judge Sheindlin's observations in *Sanchez* are also applicable to demonstrate that Mateo is less culpable than the average drug conspirator:

> There are many roles in a conspiracy. A typical conspiracy involves a supplier, a courier, a middleman and a buyer. If his role must be typed, Sanchez must be classified as a middleman. His role was to bring together the buyer and the seller. . . . The most culpable conspirator is usually the supplier, the conspirator who controls large quantities of drugs. The courier also ranks high on the culpability scale because he or she carries drugs from place to place and often uses weapons or other elements of violence. The next most culpable must be the buyer as he or she distributes quantities of drugs to other dealers, thereby becoming a retail level supplier. In my view, the least culpable is the facilitator (or those who assist the deal by acting as driver or lookout). As a facilitator, Sanchez is by definition less culpable than the typical offender convicted of conspiracy to distribute drugs.

925 F.Supp. at 1013 (footnote omitted). The Court concludes that Mateo's role in the drug conspiracy was "minor" within the meaning of U.S.S.G. § 3B1.2(b). *See also United States v. Delgado*, 994 F.Supp. 143 144 (E.D.N.Y.1998) (granting "minimal" role adjustment to courier who smuggled 700 grams of heroin into the United States from Colombia).

## C. PRE–SENTENCE CONFINEMENT CONDITIONS

Whether the conditions under which a defendant is confined prior to sentencing could serve as permissible grounds for a downward departure has been a subject of extensive debate and divergence among the courts. *See, e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir.2001) (finding no clear consensus among circuit and district courts concerning " 'the propriety of granting a downward departure for conditions of pretrial confinement' ") (quoting *United States v. Francis*, 129 F.Supp.2d 612, 616 (S.D.N.Y.2001)). In *Carty*, the Second Circuit found that "[n]o evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines." 264 F.3d at 196. Having determined that the Guidelines did not categorically proscribe consideration of this factor, the Circuit court held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." [3] *Id.; see also United States v. Hernandez–Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996); *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir.1998).

Other courts that squarely considered the question have held presentence conditions of confinement to be a factor unmentioned by the Sentencing Guidelines, and granted downward departures on this ground upon finding circumstances that took the case outside the heartland of the

---

**3.** Prior to *Carty*, a number of courts in this Circuit, expressing uncertainty about the existence of authority to depart on this ground, sidestepped the issue, declining to depart on the basis of the facts of the particular case. *See Francis*, 129 F.Supp.2d at 614–15 (citing cases). Some courts in other districts have noted, without specifically so holding, that the Guidelines do not foreclose consideration of conditions of pre-trial confinement as possible grounds for downward departure. *See United States v. Sutton*, 973 F.Supp. 488, 492 (D.N.J. 1997) (citing cases). At least one court ruled that conditions of presentence confinement cannot serve as a basis for departure permissible under the Guidelines. *See United States v. Booher*, 962 F.Supp. 629, 635–36 (D.N.J. 1997), *rev'd*, 159 F.3d 1353 (3d Cir.1998).

applicable guidelines. *See Francis,* 129 F.Supp.2d 612, 614–619 (finding that a departure was warranted "to acknowledge the qualitatively different, substandard conditions to which Defendant was subjected for an extended period" while in custody at a state facility); *United States v. Rodriguez,* 213 F.Supp.2d 1298, 1303 (M.D.Ala.2002) (granting a downward departure based on defendant's rape by a prison guard while in custody awaiting sentence); *United States v. Bakeas,* 987 F.Supp. 44, 50 (D.Mass.1997) ("[A] downward departure is called for when, as here, an unusual factor makes the conditions of confinement contemplated by the guidelines either impossible to impose or inappropriate.").

In a somewhat analogous situation, courts have determined that potential conditions of confinement that a particular defendant is likely to encounter while in custody after sentencing could constitute permissible ground to depart under proper circumstances. In *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court held that the District Court did not abuse its discretion by considering as a permissible basis for downward departure the defendants' susceptibility to abuse in prison by reason of their status as police officers and the extraordinary notoriety and national news coverage their crimes had generated. *See id.* at 111–12, 116 S.Ct. 2035; *see also United States v. Lara,* 905 F.2d 599, 601 (2d Cir.1990) (upholding a downward departure grounded on defendant's potential for victimization in prison due to his diminutive size, immature appearance and bisexual orientation); *but see* 1991 U.S.S.G.App. C, Amdt. 386 (effective Nov. 1, 1991) (amending the 1989 Guidelines to make defendant's physical appearance, including physique, a discouraged factor); *see also United States v. Wilke,* 156 F.3d 749, 750 (7th Cir.1998) (noting that the district court could consider the defendant's extreme vulnerability to abuse in prison in determining whether a downward departure was warranted, though cautioning that this consideration should be "reserved for extraordinary situations"); *United States v. Maddox,* 48 F.3d 791–794 (4th Cir.1995); *United States v. Smith,* 27 F.3d 649, 653 (D.C.Cir.1994); *United States v. Ruff,* 998 F.Supp. 1351, 1354–55 (M.D.Ala. 1998).

In recognizing the offender's pre- or post-sentence conditions of confinement as permissible grounds to warrant downward departures, the courts have granted relief generally where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner. *See, e.g., Rodriguez,* 213 F.Supp.2d at 1303 (noting that "to fail to take this rape into account in [defendant's] sentence would mete out a disproportionate punishment to her ...."); *Francis,* 129 F.Supp.2d at 619 (finding that defendant had suffered "extraordinary stress and fear" under conditions at a state prison qualitatively different from those experienced by detainees of federal detention facilities).

At bottom, however, what these cases have in common, though not explicitly articulated, is the rationale uniformly manifest in every justifiable departure from the sentencing norm embodied in the heartland of typical cases: the philosophical underpinnings of sentencing left unaltered by the Guidelines. In *Koon,* the Supreme Court instructed the courts to consider the " 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole.' " 518 U.S. at 96, 116 S.Ct. 2035 (quoting *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)). A point of departure for that inquiry as regards any "particular sentence to be im-

posed" is § 3553(a)(2) of the Sentencing Reform Act of 1984 (the "Act"), which directs the courts to consider:

(2) the need for the sentence imposed—

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3353(a)(2).

In fashioning the Sentencing Guidelines Congress authorized to achieve the goals the Act contemplates—greater honesty, uniformity, proportionality and equity in sentencing among particular offenses and offenders—the United States Sentencing Commission carved out a large "heartland" of typical cases as to which the sentence imposed must fall within the range prescribed by the particular guideline application. *See Koon,* 518 U.S. at 92, 116 S.Ct. 2035. But Congress also recognized "the wisdom, even the necessity of sentencing procedures that take into account individual circumstances." *Id.* Accordingly, the Act confers upon the district courts the latitude to depart from the applicable guideline range "if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). To this end, departure is warranted in what the Sentencing Commission defined as the "atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm . . . ." 2002 U.S.S.G., Ch. 1 Pt. A, p. 6.

The Court's discretion to depart from the prescribed guidelines range in exceptional circumstances gives expression to a core principle at the heart of sentencing from time immemorial, a safety valve which recognizes that in some respect every sentence must take differential account of "individual circumstances" and, to this end, gives the judge sufficient discretion to do so. *Koon,* 518 U.S. at 92, 116 S.Ct. 2035. Because, considered person-by-person, those particularities are so many and so varied, and because the statutorily declared aims of sentencing also embody multiple variables, not every sentence can be predetermined by unremitting application of the factors and the calculus of the specified guidelines analysis, however prescient and wise the Sentencing Commission may be. *See* 2002 U.S.S.G., Ch. 1 Pt. A, p. 6 ("[I]t is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision."). Were sentences to be mechanically fashioned with such Procrustean rigidity, the inevitable result in many cases would be harshly inequitable penalties that would fall with disproportionate weight on the particular defendant, to that extent not fittingly serving the purposes of sentencing in the case. It is precisely this potential inequity that the departure exception seeks to avert.

The individual treatment that the court's discretion to depart permits where appropriate thus reflects another inherent premise: that there is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range. In

fact, beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.

Undoubtedly, there is some leveling ground where the force of incarceration works equal and reasonably foreseeable deprivations on all offenders. *See, e.g., Koon,* 518 U.S. at 110–11, 116 S.Ct. 2035 (noting that "[i]t is to be expected" that a public official convicted of a crime will suffer loss of job and future career opportunities). There are also instances, however, in which, by reason of individual circumstances, some of the stings and hardships that imprisonment implies come to bear extraordinarily more heavily on some inmates than on others. Particularities affecting some individuals may cause some of the adjunct losses that follow criminal conviction to engender what amounts to materially enhanced deprivations and suffering that, for some offenders more than others, may operate as functional equivalents of punishment by time in prison and that may also consequentially produce other substantially greater adverse social effects.

For instance, by some scale of reckoning of felt punishment and collateral consequences—an assessment often more intuited by empathy and moral ethos than methodically calculable—the pain and suffering endured during twelve months in custody by a mother who is the sole provider of five dependent children and who, in her first transgression, stole to feed them, may fairly be regarded as qualitatively greater than that felt during an equal prison term by a career offender with no family ties for

whom jail effectively serves as a primary residence. *See, e.g., United States v. Johnson,* 964 F.2d 124, 126–30 (2d Cir. 1992) (holding that where defendant's parental responsibilities were extraordinary and incarceration would "wreak extraordinary destruction" on her four young dependents, downward departure to avoid imprisonment was warranted); *see also United States v. Milikowsky,* 65 F.3d 4, 8 (2d Cir.1995) ("Among the permissible justifications for downward departure ... is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties.").

In essence, the court's discretion to depart is a manifestation of the necessity for a just sentencing scheme to include provisions for that reasoned intuitive judgment, rather than a hard, deterministic formula, to govern the rare case. Precisely for this reason the Guidelines " 'place essentially no limit on the number of potential factors that may warrant a departure.' " *Koon,* 518 U.S. at 106, 116 S.Ct. 2035 (quoting *Burns v. United States,* 501 U.S. 129, 136–37, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991)); *see also* 2002 U.S.S.G. Ch. 1 Pt. A, p. 6 (noting that the Commission "does not intend to limit the kinds of factors, whether or not mentioned anywhere in the guidelines, that could constitute grounds for departure in an unusual case").

In a similar vein, inevitably associated with confinement, whether before or after sentencing, is a substantial amount of privation and suffering deriving from the rigors of prison life. Within the bounds of what ordinary custodial conditions encompass is the inmate's endurance of some degree of known and expected, and even necessary indignities, humiliations, inadequacies and harsh conditions. Given the character of the prison population, and the strict regimen and tensions under which it

is housed, the penal system must accommodate, within fair limits, tolerance for a normal level of shortcomings in the quality of certain services, as well the vulnerability of some individuals to incidental inmate-to-inmate and guard-to-inmate victimization that is not uncommon in a custodial environment. The concept of what is "just punishment" thus contemplates a prospective, empirical assessment, necessarily imprecise, of the accumulation of reasonably foreseeable, ordinary hardships and suffering that any given offender is likely to experience in the typical case during the course of a particular range of imprisonment.

Accordingly, insofar as the incarceration of a particular offender imposes terms and conditions that expand the reach of consequences ordinarily associated with confinement substantially beyond the zone of what is to be reasonably foreseeable and "to be expected," *Koon*, 518 U.S. at 110, 116 S.Ct. 2035, in the typical case, the corresponding sentence is likely to work excessive hardships and exact a toll of suffering "of a kind, or to a degree", 18 U.S.C. § 3553(b), that, if not otherwise mitigated, would inflict upon the particular individual a magnitude of punishment effectively disproportionate to that meted out to offenders in the ordinary case. To that extent, that penalty may exceed what is necessary to serve the prescribed purposes of sentencing.

Under the preceding standards, occasional shoves and knocks arising from necessary disciplinary encounters may fall within the realm of the warranted physical contacts an inmate may expect to suffer at the hands of prison guards during the ordinary course of presentence confinement. However, a rape is not. *Compare United States v. Londono–Jimenez*, No. 99 Cr. 81–01, 2000 WL 1593381, at *6 (S.D.N.Y. Oct.25, 2000), *Sutton*, 973

F.Supp. at 494–95, and *United States v. Miranda*, 979 F.Supp. 1040, 1044–45 (D.N.J.1997), *with Rodriguez*, 213 F.Supp.2d at 1303, and *Francis*, 129 F.Supp.2d at 619.

██ Turning to the case at hand, Mateo asserted, among other grounds for departure, two incidents she experienced at the federal detention facility while awaiting sentence by this Court: sexual abuse by a prison guard and the birth of a child without medical attention. At the hearing the Court conducted to examine these allegations, the Government stipulated that Mateo did not receive proper medical attention in connection with Johan's birth. The uncontradicted evidence shows that Mateo suffered labor pains for over fifteen hours before assistance arrived, and that for at least thirteen of those hours, she was left in her cell unit without any medical attention at all. Mateo testified that she was afraid and in severe pain. An obstetrician-gynecologist testified that it is especially important for a woman in labor to be surrounded by professionals who can reassure her and provide her emotional support. The doctor testified that, under ordinary care, Mateo would have received pain medication and the necessary emotional support. Mateo's subsequent psychological history demonstrates that the hours of fear and pain exacted a harsh toll on her mental well-being. In regard to the allegations of sexual harassment, the Court credits the testimony of Mateo and her cellmate that they were subject to the humiliating experiences of being twice ordered, under threat of penalties, to undress in front of a male prison guard.

As mentioned, in the typical case some vulnerability by the inmate to the possibility of ordinary derelictions on the part prison officials is to be expected as an incidence of the usual hardships associated with incarceration. In this Court's assess-

ment, however, the presentence misconduct Mateo endured at the hands of custodial officials is qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case. Mateo could certainly anticipate occasions in which a prison guard would behave in a sexually offensive manner through acts of the type that ordinarily occur in any setting where men and women must interact on a regular basis. But, objectively, she could not have expected to accept that being ordered, more than once, to strip in front of a male guard and placed in fear of disciplinary consequences if she did not, constitutes an ordinary incidence of the conditions of custodial life.

Similarly, Mateo could expect that the quality of medical attention she would receive for her pregnancy and birth of a child during her incarceration would not equate to the quality of health care she would receive in private medical facilities outside the prison walls. She could not anticipate, however, that when the time arrived for her to give birth, an event the imminence of which was known to prison officials, her cries and calls for help would be ignored by the custodial officials placed in charge of her health and safety, that she would be forced to endure full labor in her cell and halls of the prison where she was housed, and that she would thus be subjected to the extreme fear of risk to her life and that of her child. To this extent, the extraordinary trauma Mateo has already suffered during the time she has served in custody, the full effects of which can never be comprehensively gauged, has inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines for Mateo's offense. The Court emphasizes that Mateo's experience is uniquely extraordinary, beyond the heartland of ordinary disparities, thereby justifying departure. The Court concludes that the combined effects of the two presentence incidents Mateo experienced support a nine-level downward departure.

### D. *EXTRAORDINARY FAMILY CIRCUMSTANCES*

■ A defendant's family obligations "are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. In considering this "discouraged" basis for departure, "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon,* 518 U.S. at 96, 116 S.Ct. 2035. A downward departure for extraordinary family circumstances is not intended to reduce the culpability the defendant; its rationale is to avoid "wreak[ing] extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *Johnson,* 964 F.2d at 129.

In this case, Mateo's two young children have been thrust into the care of Mateo's relatives, who report extreme difficulties in raising them. Because both fathers are absent, the children, now ages six and one, will be raised apart from both biological parents for as long as Mateo is in custody. This burden is especially acute upon Mateo's newborn child, Johan. The facts of this case fall within the parameters of other cases in which the Second Circuit has upheld downward departures for extraordinary family circumstances. *See United States v. Galante,* 111 F.3d 1029, 1035 (2d Cir.1997) (upholding departure where defendant supported two children and where defendant's wife earned less than half defendant's income); *Johnson,* 964 F.2d at 129–30 (upholding departure

where defendant was "solely responsible for the upbringing of her three young children, including an infant, and of the young child of her institutionalized daughter"); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991) (upholding departure where defendant supported his wife, two daughters, disabled father, and grandmother); *cf. United States v. Smith*, 331 F.3d 292, 293–94 (2d Cir.2003) (reversing departure where defendant's employed wife could support defendant's son and where defendant's mother lived nearby to assist with childcare).

The Court notes that, unlike *Alba* or *Galante*, in which the Second Circuit upheld a downward departure, and *Smith*, in which the Second Circuit reversed the departure, Mateo does not have a spouse who can care for her children. *Cf. Johnson*, 964 F.2d at 129 ("Johnson's situation, in fact, is substantially more compelling than that of the defendant in *Alba*, whose children were ages four and eleven, and whose spouse could care for their children and elderly dependents"). The Court concludes that these facts provide a separate and independent basis for a nine-level downward departure.

### E. COMBINATION OF FACTORS

■ Even where no single basis for departure would be sufficient, the 2001 Guidelines recognize the possibility of a "extraordinary case" in which a combination of factors falls outside the heartland of cases and justifies departure. *See* U.S.S.G. § 5K2.0 cmt.; *see also Broderson*, at 459 n. 1 (holding that the aggregate of considered and unconsidered factors may justify downward departure).

In the alternative, the Court finds that the combination of Mateo's extraordinary family and pre-sentence confinement circumstances warrants the nine-level departure, even if the Court were to have concluded that the factors did not individually support a departure.

### F. EXTREME VULNERABILITY

■ Mateo also seeks departure on the ground that she is particularly vulnerable to abuse in a prison setting. Mateo relies upon *Lara*, in which the Second Circuit upheld a downward departure for a bisexual defendant to account for the defendant's "immature appearance, sexual orientation and fragility." 905 F.2d at 603. The defendant had been victimized already in prison, and the only way to protect him was to place him in solitary confinement. *Id.* ("The severity of Morales' prison term is exacerbated by his placement in solitary confinement as the only means of segregating him from other inmates."). The Court finds *Lara* inapplicable to the present facts. There is no indication that Mateo is any more vulnerable to prison abuse than any other incarcerated woman, especially because she has been moved from the MDC to the MCC precisely to avoid the corrections officer who had harassed her previously. Accordingly, the Courts declines to depart on this basis.

### III. ORDER

For the reasons stated, it is hereby

**ORDERED** that the motion of defendant Jubelquis Mateo ("Mateo") for a downward departure of the sentencing range applicable under the United States Sentencing Guidelines is granted on the grounds of Mateo's extraordinary presentence confinement and family circumstances, or on a combination of these factors, and denied on the ground of extreme vulnerability; and it is hereby

**ORDERED** that, for the purposes of determining the sentence of criminal defendant Jubelequis Mateo, the Offense

Level under the Sentencing Guidelines shall be reduced to sixteen (16).

**SO ORDERED.**